**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 N. California Boulevard, Floor 9
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WHALEN and VICTOR FUENTES, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br> v.<br><br>NBA PROPERTIES, INC.,<br><br>     Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.      HISTORY AND OVERVIEW OF THE VPPA ...................................................... 2

    II.     DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER .................................... 3

    III.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES ........... 4

        A.    Testing Reveals That Defendant Illegally Shares Users' PII With Third Parties Through Its NBA App ......................................... 4

            1.    Overview of the Braze API ................................................ 6

            2.    Overview of the Amplitude API ........................................... 7

            3.    Overview Of The Adobe API ............................................... 9

        B.    Defendant Discloses Android Users' PII To Braze And Amplitude ............................................................................... 12

            1.    Defendant Discloses Android Users' E-Mail Addresses to Braze ...................................................................... 12

            2.    Defendant Discloses Users' User IDs to Braze and Amplitude ........................................................................ 12

            3.    Defendant Discloses Android Users' Geolocation to Amplitude ........................................................................ 13

            4.    Defendant Discloses Android Users' Advertising IDs to Amplitude .................................................................... 16

        C.    Defendant Discloses iOS Users' PII To Braze And Adobe ....................... 17

            1.    Defendant Discloses iOS Users' Email Addresses To Braze And Adobe ............................................................. 17

            2.    Defendant Discloses iOS Users' User IDs And IDFAs To Adobe ....................................................................... 18

    IV.   DEFENDANT DISCLOSES USERS' PII TO THE THIRD PARTIES FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS ...... 21

    V.    DEFENDANT KNOWINGLY DISCLOSES ITS USERS' PII TO THE THIRD PARTIES ................................................................................... 23

    VI.   PLAINTIFFS' EXPERIENCES ....................................................................... 25

THE PARTIES ........................................................................................................27

JURISDICTION AND VENUE ...............................................................................28

CLASS ALLEGATIONS ..........................................................................................28

CAUSES OF ACTION .............................................................................................30

PRAYER FOR RELIEF ............................................................................................32

JURY DEMAND ......................................................................................................33

Plaintiffs James Whalen and Victor Fuentes ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant NBA Properties, Inc. ("NBA" or "Defendant") for violating the Video Privacy Protection Act ("VPPA").

2.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

4.      Defendant develops, owns, and operates "NBA: Live Games & Scores," a mobile phone application that hosts a wide array of live and pre-recorded sports videos watched by millions of consumers nationwide (the "App" or the "NBA App").[1] The application is available for both free and paid use on the Google Play Store for Android users and the Apple App Store for iOS users.[2]

5.      Unbeknownst to Plaintiffs and Class Members, however, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user coupled with those users' real-world names and email addresses—to

---

[1] The App shall mean both the Android and iOS versions of the App, unless otherwise specified.

[2] *NBA: Live Games & Scores*, GOOGLE PLAY STORE, https://play.google.com/store/apps/details?id=com.nbaimd.gametime.nba2011&hl=en_US&pli=1; *NBA: Live Games & Scores*, APP STORE, https://apps.apple.com/gb/app/nba-live-games-scores/id484672289.

---

unrelated third parties, including but not limited to Braze, Amplitude, and Adobe (collectively, the "Third Parties"). By doing so, Defendant violates the VPPA.

6. Plaintiffs bring this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

### I. HISTORY AND OVERVIEW OF THE VPPA

8. The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (1988) (cleaned up).

9. In 2012, Congress amended the VPPA, and in doing so, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

10. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

11.    Defendant owns, operates, and maintains the NBA App.  The App is an official product of the National Basketball Association, one of the most-watched sports leagues in the world.

12.    Certain of Defendant's videos are free to watch on the App, however, Defendant also offers more benefits through paid access via Defendant's NBA League Pass.  Defendant offers two tiers to paid subscriptions: the NBA League Pass and the NBA League Pass Premium.  A monthly NBA League Pass subscription costs $16.99, while a Season League Pass subscription costs $109.99.[3]  A monthly NBA League Pass subscription costs $24.99, while a Season League Pass Premium costs $159.99.[4]

13.    The true gem of the League Pass is the ability to watch every NBA finals game since 1990.[5]  Free account holders do not have the benefit of accessing every NBA finals game since 1990. In addition, both subscription plans offer access to live and pre-recorded videos of NBA games, as well as pre-recorded "condensed" game replays that allow users to "catch up on the game's best moments."[6]  Both plans also offer "[a]ccess to full game archives starting from the 2012-2013 season to the present[.]"[7]  On top of this, the League Pass Premium plan offers users the option to download games "for offline viewing," more devices to stream games on, and removes commercials.[8]

---

[3]    NBA,    https://www.nba.com/watch/league-pass-stream?cid=nba:paid:sem:sa360:dlp:lpsub: dom:t-dtcacq:mtlr-1351_1:FY25_G_US_Primary_LeaguePass_English_All:LP_Core_Phrase: leaguepass:43700079788563241:&utm_medium=paid_search&utm_source=sa-360_na&utm_ campaign=domestic-league-pass_lp-subscription&utm_content=nba:paid:sem:sa360: dlp:lpsub:dom:t-dtcacq:mtlr-1351_1:FY25_G_US_Primary_LeaguePass_English_All:LP_Core_ Phrase:leaguepass:43700079788563241:&gad_source=1&gclid=CjwKCAjwmaO4BhAhEiwA5p4 YL1CqoDJkyeYFlb8SUv5HiDSSyor1PwdHk3PxjFIgrPXi6vCQHBJotRoCDw4QAvD_BwE&gcl src=aw.ds.

[4]    See    NBA,    https://www.nba.com/watch/league-pass-stream?cid=nba:paid:sem:sa360:dlp:lpsub :dom:t-dtcacq:mtlr-1351_1:FY25_G_US_Secondary_General_English_All:NBA_General_Broad: NBA:43700073438980093:&utm_medium=paid_search&utm_source=sa-360_na&utm_campaign =domestic-league-pass_lp-subscription&utm_content=nba:paid:sem:sa360:dlp:lpsub:dom:t-dtcacq:mtlr-1351_1:FY25_G_US_Secondary_General_English_All:NBA_General_Broad: NBA:43700073438980093:&gad_source=1&gclid=Cj0KCQjw4Oe4BhCcARIsADQ0csnqwubq9j ZELfEn6IjeQW7pyhCEaUXJRNQRHpHR3Cw-wxImz143zFkaAu2GEALw_wcB&gclsrc=aw.ds.

[5]    *NBA Finals Classics*, NBA, https://www.nba.com/watch/list/collection/nba-finals-classics.

[6]    *NBA League Pass*, NBA.COM, https://support.watch.nba.com/hc/en-us/articles/115000585974-NBA-League-Pass.

[7]    *Id.*

[8]    *Id.*

---

14.     To pay for an NBA League Pass, individuals must first have an "NBA ID."[9]  An NBA ID requires user to provide Defendant with their first name, last name, and e-mail address in the sign-up process.  In other words, all users who pay for and use the NBA League Pass necessarily provided Defendant with their first name, last name, and e-mail address in the sign-up process.

15.     Through the paid League Pass, subscribers also receive access to further content such as "NBA archives," NBA "studio content," and more.[10]

16.     In addition, Defendant allows paid subscribers to receive "personalized" updates on their "favorite teams and players," "the latest basketball news, highlights, game previews and recaps," and access "behind the scenes content."[11]

## III.    DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

### A.    Testing Reveals That Defendant Illegally Shares Users' PII With Third Parties Through Its NBA App

17.     In August 2023, Plaintiffs' counsel retained a private research company to review and conduct a dynamic analysis on the Android version of the NBA: Live Games & Scores App ("NBA App" or "App").  A "dynamic analysis" records the transmissions that occur from a user's device.

18.     The private researchers tested what information (if any) Defendant discloses when a user watches a video on the NBA App.  The analysis revealed that Defendant discloses to third parties information sufficient to identify specific users and the exact videos they watch.

19.     The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its App.

20.     APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[12]

---

[9] *Sign up*, NBA.COM, https://www.nba.com/account/sign-up.

[10] *About this app*, GOOGLE PLAY, https://play.google.com/store/apps/details?id=com.nbaimd.gametime.nba2011&hl=en-US.

[11] *About this app*, GOOGLE PLAY, https://play.google.com/store/apps/details?id=com.nbaimd.gametime.nba2011&hl=en-US.

[12] *Application Programming interface (API)*, IBM, https://www.ibm.com/cloud/learn/api.

21.     An API can "work[] as a standalone solution or included within an SDK. … [A]n SDK often contains at least one API."[13]  "SDK" stands for software development kit and "is a set of software-building tools for a specific program, while "API" stands for application programming interface, and, as used in this Complaint, "SDK" and API" are referring to the same software.[14]

22.     Defendant integrates into the App the Braze API, an API owned and operated by a company of the same name that describes its API as a "customer engagement platform."[15]

23.     Defendant also integrates into the App the Amplitude API, an API owned and operated by a company of the same name that describes itself as an "all in one easy-to-use platform" which enables businesses to "see everything that customers do."[16]

24.     The dynamic analysis found that when a user views a video on the Android NBA App, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior.

## Summary of Third-Party Exfiltration

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Braze** | Video ID, Video Name | Email* | NBA Customer ID*, Order ID* |
| **Amplitude** | Video ID, Video Name | Proximal Geolocation | AAID, NBA Customer ID* |

25.     Specifically, when a user views a video on the Android NBA App, Defendant discloses to Braze via the Braze API (i) a user's e-mail address, (ii) a user's User ID, (iii) the title of the specific video viewed by the user, and (iv) the video ID for the specific video viewed by the user.

---

[13] *SDK vs. API: What's the Difference?*, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/.

[14] *Id.*

[15] ABOUT BRAZE, https://www.braze.com/company/careers.

[16] *Build Great Digital Products & Experiences*, BRAZE, https://www.amplitude.com/digital-analytics-platform.

26.     Further, when a user views a video on the Android NBA App, Defendant also discloses to Amplitude via the Amplitude API (i) a user's precise geolocation, (ii) a user's User ID, (iii) a user's Android Advertising ID ("AAID"), (iv) the title of the specific video viewed by the user, and (v) the video ID for the specific video viewed by the user.

27.     In addition, the dynamic analysis found that when a user views a video on the iOS NBA App, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video viewing behavior.

## Summary of Third-Party Exfiltration 

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Braze** | Video ID, Video Name | Email | - |
| **Adobe (omtrdc.net)** | Video ID, Video Name | Email | User ID, IDFA |

28.     Specifically, when a user views a video on the iOS NBA App, Defendant discloses to Braze via the Braze API (i) a user's email address, (ii) a user's User ID, (iii) the title of the specific video viewed by the user, and (iv) the viewed video's video ID.

29.     Further, when a user views a video on the iOS NBA App, Defendant also discloses to Adobe via the Adobe API (i) a user's email address. (ii) a user's User ID, (iii) a user's IDFA, (iii) the title of the specific video viewed by the user, and (iv) the viewed video's video ID.

   *1.   Overview of the Braze API*

30.     When developers build a mobile application, they typically outsource particular functions, like marketing, advertising, and analytics, to third party providers.  Braze, Amplitude, and Adobe are examples of these third parties.

31.     As Braze notes on its website, Braze is a "customer engagement platform" that "power[s] customer-centric interactions between consumers and brands in real-time."[17]

---

[17] BRAZE, https://www.braze.com/.

32.     Once integrated into a developer's mobile application, the Braze API allows an app developer to, among other features, analyze app data in real time and conduct real-time targeted marketing campaigns[18] and send personalize push notifications and in-app messages to mobile users.[19]

33.     As alleged in greater detail below, Defendant utilizes each and every one of these features of the Braze API in its App and sends users' PII to Braze through the Braze API in order to assist with Defendant's marketing, advertising, and analytics efforts.

## 2.  Overview of the Amplitude API

34.     Similarly, Amplitude is a platform that provides "[e]mpowering tools for marketing teams."[20]  The "tools" include the Amplitude SDKs and APIs, which allow app developers to, among other features, track individual app users by creating "one united profile for each customer that draws from all touchpoints, channels, and devices."[21]

35.     Amplitude can create profiles for customers by first identifying them through "a combination of three different methods to identify your users: device IDs, Amplitude IDs, and user IDs."[22]  The first, AAIDs referenced here, come "directly from your users' devices."[23]

36.     User IDs, another layer of identification that Amplitude offers developers like Defendant, are "unique identifier[s] applied to individual users."[24]  "Amplitude can use a user ID to

---

[18] *Data & Analytics*, Braze, https://www.braze.com/product/data-and-analytics.

[19] *Mobile & Web Push*, Braze, https://www.braze.com/product/mobile-web-push; In-App & In-Browser Messaging, Braze, https://www.braze.com/product/in-app-in-browser-messages.

[20] *Solutions*, Amplitude, https://www.amplitude.com/solutions/marketing.

[21] *Id.*

[22] *How Amplitude identifies your users*, Amplitude, https://amplitude.com/docs/get-started/identify-users#:~:text=Amplitude%20uses%20a%20combination%20of,conclusively%20identify%20a%20unique%20user.

[23] *Id.*

[24] *Id.*

reconcile events across multiple devices under the same user ID."[25]  "Once set, you can't change user IDs in Amplitude."[26]

37.    In addition, "Amplitude merges a user's event data on the backend: this connects the correct user ID to any anonymous events the user generated before the assignment of their user ID."[27]

38.    Amplitude's technology then analyzes the captured user data and generates several types of reports.  These reports create cohorts of users "who share a trait or set of traits."[28] Developers are then able to use the "cohorts" from user data to better predict consumer behavior.[29]

39.    Moreover, Defendant offers an AI feature called "Ask Amplitude," which "uses [its clients'] taxonomy and business context to build and edit charts using natural language."[30]  In other words, Defendant acquires, learns, and compiles its end users' information into insights and actionable analytics.  These analytics are then used by Defendant to bolster its marketing and advertising efforts through targeting customer engagement improvement and advertising.

40.    As alleged in greater detail below, Defendant utilizes each and every one of these features of the Amplitude API in its App and sends users' PII to Amplitude through the Amplitude API in order to assist with Defendant's marketing, advertising, and analytics efforts.

---

[25] *How Amplitude identifies your users*, AMPLITUDE,  https://amplitude.com/docs/get-started/identify-users.

[26] *Id.*

[27] *How Amplitude identifies your users*, AMPLITUDE,  https://amplitude.com/docs/get-started/identify-users.

[28] *Identify users with similar behaviors*, AMPLITUDE,  https://amplitude.com/docs/analytics/behavioral-cohorts.com.

[29] *Behavioral Cohorts API*, AMPLITUDE,  https://www.amplitude.com/docs/apis/analytics/behavioral-cohorts.

[30] *Ask Amplitude*, AMPLITUDE, https://amplitude.com/docs/analytics/ask-amplitude.

### 3. Overview Of The Adobe API

41.     Among other products, Adobe provides Adobe Analytics for mobile applications, which is a "robust data analysis platform"[31] that "delivers comprehensive … app analytics along with best-in-industry visualizations and reporting, helping product teams to quickly and easily optimize mobile engagement."[32] Adobe Analytics offers customers like Defendant a comprehensive toolset to "[o]ptimize mobile performance," "[u]nderstand [their] audience," and "[s]cale mobile engagement."[33]

42.     To provide its services, Adobe Analytics provides customers like Defendant with "[o]pen APIs" to collect user data.[34] Adobe Analytics then collects the user data by using a tool called "tags."[35] "Tags are at the heart of any analytics practice. They make it possible for [Defendant] to collect data."[36] Specifically, tags allow Defendant to "capture and use customer data as [it] please[s]."[37]

43.     After the Adobe Analytics tags collect user data for Defendant from users in the App, Adobe provides Defendant with a detailed tool, Analysis Workspace, to analyze the collected data. The Analysis Workspace is the "one place to dynamically analyze any number of data tables, visualizations, and components to create breakdowns and segments, and much, much more. All in real time."[38] The analyzed data shows customers like Defendant what is and is not working for its

---

[31] *What is Analytics*, ADOBE EXPERIENCE LEAGUE, https://experienceleague.adobe.com/en/docs/analytics-learn/tutorials/intro-to-analytics/what-is-analytics.

[32] *Mobile App Analytics*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/mobile-app-analytics.html.

[33] *Id.*

[34] *Tag Management*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/tag-management.html.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Ad Hoc Analysis*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/ad-hoc-analysis.html.

---

mobile applications to "find out what's going on in your business. What are your customers doing? How is that affecting revenue? Why is this campaign working and that one isn't?"[39]

44.     The following screenshot depicts an example of the Adobe Analysis Workspace dashboard that analyzes the user data Defendant captures through the Adobe Analytics API. Adobe collects and updates Defendant's dashboard in real time, with "high-frequency metrics and site analytics to visually report traffic and page view trending."[40] This ensures Defendant "understands trends in [its] data from minute to minute, within seconds of collection."[41] Notably, the Adobe Analytics dashboard shows customers like Defendant the total visits, the total number of unique visitors, and the number of page views per specific page.[42]



---

[39] *Ad Hoc Analysis*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/ad-hoc-analysis.html.

[40] *Real-Time Reporting Overview*, ADOBE EXPERIENCE LEAGUE, https://experienceleague.adobe.com /en/docs/analytics/components/real-time-reporting/realtime.

[41] *Id.*

[42] *See Analysis Workspace Overview¸* ADOBE EXPERIENCE LEAGUE, https://experienceleague.adobe. com/en/docs/analytics-learn/tutorials/analysis-workspace/analysis-workspace-basics/analysis-workspace-overview.

45.    In addition, tools like Audience Manager help Defendant "bring [its] audience data assets together, making it easy to collect commercially relevant information about site visitors, create marketable segments, and serve targeted advertising and content to the right audience."[43]

46.    Ultimately, "[a]ction is the end game for all [of Defendant's and Adobe's] data gathering and insight finding. If you can't take action, then those valuable insights are wasted."[44] Indeed, as Adobe's documentation explains, "[s]ome of the most valuable insights for [Defendant] to act on are audience segments that [it has] created, refined, and developed real understanding of."[45]

47.    Adobe even offers suggestions of what actions customers like Defendant should take to improve retention of their consumer base.  For example, Adobe provides "[s]tatistical modeling and machine learning that automatically … combs through vast amounts of data to immediately identify factors that are impacting [Defendant's] business."[46]

48.    Further, Adobe also offers tools specific to advertising to allow Defendant to "get more out of [its] ad investing."[47] Adobe "pulls real-time data" to help Defendant "create richer, more data-driven ads."[48]  Doing so also allows Defendant to know "whether [its] ads are effective or well spent."[49]

49.    Thus, Adobe provides Defendant with an extensive suite of tools to collect, analyze, and predict courses of action on its mobile application that best align with Defendant's business goals to improve targeted advertising, create a more engaging user experience, and grow its user base.

---

[43] *Audience Manager Overview*, ADOBE EXPERIENCE LEAGUE, https://experienceleague.adobe.com /en/docs/audience-manager/user-guide/overview/aam-overview.

[44] *Shared Audiences*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics /shared-audiences.html.

[45] *Id.*

[46] *Anomaly Detection*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/ anomaly-detection.html.

[47] *Advertising Analytics*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products /analytics/advertising-analytics.html.

[48] *Id.*

[49] *Id.*

50.    As alleged in greater detail below, Defendant utilizes each and every one of these features of the Adobe API in its App and sends users' PII to Adobe through the Adobe API in order to assist with Defendant's marketing, advertising, and analytics efforts.

**B.    Defendant Discloses Android Users' PII To Braze And Amplitude**

*1.    Defendant Discloses Android Users' E-Mail Addresses to Braze*

51.    The dynamic analysis demonstrated that Defendant was sharing the e-mail addresses of Android App users to Braze via the Braze API.

52.    An email address is a unique string of letters and numbers which designates an electronic mailbox.  As industry leaders,[50] trade groups,[51] and courts[52] agree, an ordinary person can use an email address to uniquely identify another individual.  Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.

53.    The following image is an excerpt of the data sent from the NBA App to Braze, as captured by the dynamic analysis.  The excerpt shows Defendant disclosing a user's e-mail address to Braze when a user watches a specific video:



*2.    Defendant Discloses Users' User IDs to Braze and Amplitude*

54.    A user ID is a unique string of numbers which Defendant assigns to an individual user after a user creates an NBA account.  The unique user IDs allow Defendant an additional identifier to track and categorize an individual user.

---

[50] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[51] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[52] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

55.    The Android dynamic analysis captured Defendant disclosing the same unique ID ("24c25c01-7a02-4177-Bfa7-a31dBc10c4da") to both Braze and Amplitude for an individual user's email address "prairie837@gmail.com."  This makes it likely that Defendant assigns a unique user ID to each user once a user creates an NBA App account.

"timestamp": "1685451512506",
"user_id": "24c25c01-7a02-4177-8fa7-a31d8c10c4da",
"user_properties": {

*Disclosure of User ID to Braze*

transaction_amount: 74.99,
"user profile ID": "24c25c01-7a02-4177-8fa7-a31d8c10c4da"

*Disclosure of User ID to Amplitude*

56.    This evidence also indicates that Defendant discloses a user's unique NBA App account ID along with other personally identifying information, such as a user's e-mail address, to assist in third parties' marketing, advertising, and analysis of Defendant's user data.

### 3.    Defendant Discloses Android Users' Geolocation to Amplitude

57.    Geolocation is "the identification of the real-world geographic location of an object."[53]  Geolocation identifies objects by "generating a set of geographic coordinates such as latitude and longitude through GPS and using the coordinates to determine a meaningful location."[54]

58.    Geolocation is considered precise when it provides street level accuracy.  Generally, more than four decimal places of latitude and longitude allows an individual to be tracked to within 8 meters (26.3 feet) of their actual location.[55]  Defendant's disclosure of geolocation to Amplitude is more than sufficient to identify users within an 8-meter space.

59.    The precise geolocation data sent to Amplitude is sent as latitudinal and longitudinal coordinates.  As such, an ordinary person can easily input the given values to reveal a user's precise

---

[53] *What Is Geolocation?*, INDICATIVE, https://www.indicative.com/resource/geolocation/.

[54] *Id.*

[55] *See* Best *Practices for Geolocation data in CRM Analytics*, SALESFORCE (Oct. 10, 2023), https://help.salesforce.com/s/articleView?id=000384899&type=1.

1   location.  For instance, if an ordinary person enters the transmitted geolocation data from the image

2   below into a publicly available website,[56] the user's precise location is displayed on Google Maps:





*This user is located just outside of Boston, MA.*

21      60.      Precise geolocation can be used by anyone to uniquely identify a person.  A study in

22  2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed

23  only four randomly chosen spatio-temporal points (points that represent the time and location of a

---

[56] MOVABLE TYPE SCRIPTS, https://www.movable-type.co.uk/scripts/geohash.html.

specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[57]

61.    Worse yet, an NBA app user's precise geological data is not simply disclosed to Amplitude one time, or even four times (like in the above study), but *every single time* a user interacts with the NBA app and generates event data that is sent to Amplitude.  This mass collection of precise geolocation data makes it incredibly easy for any ordinary person to determine an "individual's home address, workplace address, or geo-localized tweets or pictures," and determine their real-world identity from publicly available sources.[58]

62.    For example, say that NBA app user interacts with the app on 100 separate occasions over a two week period, and the vast majority of those geolocations are come from two points—one inside a suburban house and the other inside an office complex.  And say that the geolocations from the office building are always collected at lunchtime from Monday through Friday, and the geolocations from the suburban house are collected in the mornings before 9 a.m. and in the evenings 5 p.m. on Monday through Friday and at random times on weekends.  It is easy to infer which geolocation is that user's home address and which is his workplace address.  And any ordinary person, in turn, can then determine the app user's real-world identity and name with this home address by using various publicly available sources, like a phone book, property records, or even just a simple people search website.  And if there are multiple family members listed with that home address, any ordinary person can then use the workplace address to narrow down the results by consulting with other publicly available sources like a company website, office directory, or LinkedIn. And all that is possible by only using the most basic of identification methods. Any ordinary person can also dig into publicly available social media posts or other online sources to refine results even further.

63.    As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains it: "[r]eally precise, longitudinal geolocation information is absolutely impossible

---

[57] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

[58] *Id.*

to anonymize."[59]  In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[60]

64.    By disclosing users' geolocation data to third parties, Defendant discloses information that an ordinary person could use to identify specific users.

65.    Defendant discloses this geolocation to enhance its marketing efforts, its advertising profits, and its app analytics.

66.    Companies collect and disclose geolocation so they can maximize their advertising revenue.  As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."[61]

67.    Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[62]

68.    Defendant discloses geolocation to Amplitude so that Amplitude can help Defendant maximize marketing and advertising revenue and collect app analytics.

### 4.    Defendant Discloses Android Users' Advertising IDs to Amplitude

69.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[63]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both applications.

70.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact

---

[59] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy*, N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *See Advertising ID*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/6048248.

that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Amplitude, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers). *See also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

71.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[64]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[65]

72.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combine with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

73.    By disclosing users' AAIDs to Amplitude, a third party, Defendant discloses information that an ordinary person could use to identify its users.  The following image taken from the dynamic analysis captures Defendant disclosing a users' AAID to Amplitude via the Amplitude SDK:



C.    **Defendant Discloses iOS Users' PII To Braze And Adobe**

  1.    *Defendant Discloses iOS Users' Email Addresses To Braze And Adobe*

74.    The dynamic analysis demonstrated that Defendant discloses iOS App user's email addresses to Braze and Adobe through the respective Braze and Adobe APIs.  The following excerpt taken from the dynamic analysis demonstrates Defendant disclosing an iOS App user's email address to Braze through the Braze API.

---

[64] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST (Oct. 19, 2017), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[65] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/.

"session_id": "2F55EFD5-4DC5-4BF5-924E-80092A3BC44A",
"time": "1715001494.603",
"user_id": "bravibraveary@gmail.com"

75.     In addition, the dynamic analysis also captured Defendant disclosing iOS users' email addresses to Adobe through the Adobe API.  The following excerpt of the dynamic analysis shows Defendant disclosing an iOS App user's email address to Adobe through the Adobe API.  Although the field is labeled "nba.brazeid," this was part of the transmission that Defendant sent to Adobe.  By disclosing users' email addresses to Adobe, Defendant discloses information that even an ordinary person could use to identify individual users, much less a sophisticated media entity such as Defendant.

"nba.branchid": "13160172482211115414",
"nba.brazeid": "bravibraveary@gmail.com",

    *2.     Defendant Discloses iOS Users' User IDs And IDFAs To Adobe*

76.     The dynamic analysis also captures Defendant disclosing to Adobe the user IDs of iOS App users and the device identifier in the form of Identification for Advertisers ("IDFA") for iOS App users.  The "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device."[66]  The user IDs, as mentioned above, are likely unique identifiers that Defendant assigns to each user upon account creation.

77.     The following excerpt of the dynamic analysis shows Defendant disclosing to Adobe via the Adobe API an iOS App user's user ID "6fb4815f-6217-455a-a05a-d2900ae78de7."

...
"nba.userid": "6fb4815f-6217-455a-a05a-d2900ae78de7",

78.     The following excerpt of the dynamic analysis shows Defendant disclosing to Adobe via the Adobe API an iOS App user's IDFA.

visitor.customerIDs : {
"id": "969C3B62-FE20-42A3-80BC-DBBF522AD8D7"

---

[66] *IDFA*, APPSFLYER GLOSSARY, https://www.appsflyer.com/glossary/idfa/.

79.     An IDFA defines a unique Apple device.[67]  An IDFA, much like a website cookie, "enables advertisers to monitor users' engagement with their ads[] and keep track of their post-install activity."[68]  The IDFA thus acts as another form of identification for iOS App users.  And employing Adobe Analytics' toolkit of collection, analysis, and prediction features, Defendant applies iOS App users' IDFAs as an additional layer on top of all of its previously-collected data on iOS App users to further analyze how users respond to the App's performance, predict the best courses of action to scale its mobile application clientele, and maximize targeting ads to users.

**D.     Defendant Discloses Information Identifying Which Users Watched Which Specific Videos To The Third Parties**

80.     When Defendant transmits a user's identifiers to the Third Parties, it also transmits information sufficient to identify which specific video was watched by the user, such as the video name and video ID.

81.     ***Braze***.  Defendant discloses to Braze via the Braze API the full name and video ID of the video a user viewed on the NBA App.  For example, the following excerpt shows the traffic captured by the dynamic analysis of an Android NBA App user.  The video title the user watched is "2010 Finals Game 1: Kobe Bryant and Pau Gasol lead the Lakers to victory in opener."  The video ID for Defendant's video of that same title is "RADS2010111900026886."

```
"content type": "vod",
"premium video": "false",
"video ID": "fake_RADS2010111900026886_NBA_movie",
"video category": "Classic Games",
"video name": "2010 Finals Game 1: Kobe Bryant and Pau
Gasol lead the Lakers to victory in opener"
```

82.     In addition, Defendant discloses to Braze via the Braze API the full name and video ID of the video a user viewed on the iOS NBA App.  The following excerpt shows the traffic captured by the dynamic analysis of an iOS NBA App user.  The video title the user watched in the excerpt

---

[67] *IDFA*, APPSFLYER GLOSSARY, https://www.appsflyer.com/glossary/idfa/.

[68] *Id.*

below is "Nightly Notable: Donovan Mitchell | May 5," and the video ID for Defendant's video of that same title is "fake_E534CDAF-0B1E-11EF-967D-3CFDFEE7DB71_NBA_movie."

```
"content type": "vod",
"premium video": "false",
"video ID":
"fake_E534CDAF-0B1E-11EF-967D-3CFDFEE7DB71_NBA_movie",
"video name": "Nightly Notable: Donovan Mitchell | May 5"
```

83.    As captured above, Defendant discloses to Braze the video ID of the video an individual user watches.  This identification number correlates to the video a user watches and allows Defendant and Braze to further categorize the exact video a user watches into the user's PII, then use that information in Defendant's marketing, analytics, and advertising efforts.

84.    Given this already public level of disclosure, Defendant provides Braze with backend tools to match a video's unique ID to a video's title so that Braze can help Defendant enhance its marketing, advertising, and analytics efforts.

85.    *Amplitude*.  Defendant discloses to Amplitude via the Amplitude API the full video name and video ID of a video that a user watches on the NBA App.  The following image is an excerpt of the traffic captured by the dynamic analysis showing the disclosure of these video identifiers by Defendant to Amplitude.

```
"Media Action": "autoplay",
"Media Category": "Classic Games",
"Media Content ID": "NBA_RADS20101119000026886",
"Media Content Name": "2010 Finals Game 1: Kobe Bryant and Pau
Gasol lead the Lakers to victory in opener",
"Media Identifier": "NBA_RADS20101119000026886",
```

86.    As seen from the above excerpt, the disclosed video title is "2010 Finals Game 1: Kobe Bryant and Pau Gasol lead the Lakers to victory in opener," and the disclosed video ID is "NBA_RADS20101119000026886."  A video's title is the most direct way for a third party to understand a specific user's video-viewing information.  Indeed, with this information, even an ordinary person is able to identify the exact video a specific user watches.

87.    Given this already public level of disclosure, Defendant provides Amplitude with backend tools to match a video's unique ID to its title so that Amplitude can help Defendant enhance its marketing, advertising, and analytics efforts.

88.    ***Adobe***.  Defendant discloses to Adobe via the Adobe API the full video name and video ID of a video that a user watches on the iOS NBA App.  The following image is an excerpt of the traffic captured by the dynamic analysis showing the disclosure of these video identifiers by Defendant to Adobe.

```
"eventType": "sessionStart",
"params": {
"media.channel": "NBA App",
"media.id": "2c544968-6683-cec9-2fb8-3a123df285dd",
"media.length": "12",
"media.libraryVersion": "ios-media-3.1.0",
"media.name": "Thunder Sweep Pelicans In First Round",
"media.playerName": "NBA Engineering Mobile App",
"media.resume": "false",
"media.streamType": "video",
```

89.    As seen from the above excerpt, the disclosed video title is "Thunder Sweep Pelicans In First Round," and the video ID for Defendant's video of that same title is "2c544968-6683-cec9-2fb8-3a123df285dd."    Defendant's disclosure of the watched video's identification number correlates to the video a user watches and allows Defendant and Adobe to further categorize the exact video a user watches into the user's PII, then use that information in Defendant's marketing, analytics, and advertising efforts.

90.    Given this already public level of disclosure, Defendant provides Adobe with backend tools to match a video's unique ID to its title so that Adobe can help Defendant enhance its marketing, advertising, and analytics efforts.

## IV.    DEFENDANT DISCLOSES USERS' PII TO THE THIRD PARTIES FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

91.    ***Braze***.  Defendant transmits a user's e-mail address, user ID, video name and video ID to Braze so that Braze can analyze user behavior.  Through Braze's analysis results, Defendant's ultimate goal is to streamline how it targets different users with different marketing and advertising strategies, and thereby increase its user base.

92.    Indeed, the NBA's Associate Vice President of Content Personalization and Optimization, Kevin Scheitrum, spoke with Braze's team regarding the challenge of satisfying personalized and segmented audience priorities while also delivering widespread notifications by finding a balance in the amount of push notifications received by App users.  Scheitrum stated that "the goal ultimately is to get people inside of the product … we want to balance that with minimizing unsubscribes, minimizing un-installs, and minimizing opt-outs."[69]

93.    Scheitrum's comments were part of Forge 2023 On Demand, a symposium of Braze partners where spokespersons from various entities came together to describe "how they are making technology go right in their Customer Engagement Marketing."[70]

94.    Thus, when used by Defendant, Braze provides "confidence" through analytics to help Defendant "deliver some of the bigger sends while still not abusing trust."[71]

95.    **Amplitude**.  Defendant transmits a user's user ID, precise geolocation, AAID, video name and video ID to Amplitude so the Amplitude API can "build better products by tracking and understanding user behavior."[72]

96.    Namely, Defendant discloses users' PII to Amplitude so that Amplitude can "analyze" user metrics, "fetch a user profile," and "[s]et the User ID for a particular Device ID," for Defendant, among other features.[73]  By doing so, Amplitude allows clients like Defendant to "unit[e] all [their] data with behavioral analytics." [74]  These analytics insights allow Defendant to "[u]nderstand [its] users' activity," and "[a]nalyze [its] acquisition channels" and the "adoption of

---

[69] *How the NBA Uses Push Notifications to Celebrate History in the Making*, BRAZE (Jan. 4, 2024), https://www.braze.com/resources/articles/how-the-nba-uses-push-notifications-to-celebrate-history-in-the-making.

[70] *Forge 2023 On Demand*, BRAZE, https://www.braze.com/resources/reports-and-guides/forge2023-on-demand-gated.

[71] *How the NBA Uses Push Notifications to Celebrate History in the Making*, BRAZE (Jan. 4, 2024), https://www.braze.com/resources/articles/how-the-nba-uses-push-notifications-to-celebrate-history-in-the-making.

[72] What is Amplitude?, Amplitude, https://amplitude.com/docs/get-started/what-is-amplitude.

[73] *Analytics APIs*, AMPLITUDE, https://www.amplitude.com/docs/apis/analytics.

[74] *Analytics*, AMPLITUDE, https://www.amplitude.com/docs/analytics.

a feature." In short, Amplitude's findings aid Defendant in marketing, advertising, and analyzing user behavior in the NBA App.

97.    **Adobe**. Defendant transmits a user's e-mail address, user ID, IDFA, and video name and video ID to Adobe so that Adobe Analytics can "close the gap between data collection and real-time analytics."[75] This way, Defendant is able to "turn [its] deep data insights into action, truly understand[] [its] audience and create[e] optimized mobile experiences [App users will] love."[76]

98.    Adobe offers to "manage the [App's] entire mobile lifecycle, including personalization, engagement, audiences, and analytics — all through one high-performing SDK."[77] Through Adobe, Defendant has access to "comprehensive … app analytics along with best-in-industry visualizations and reporting."[78] This, along with Adobe's "predictive insights," helps Defendant "to quickly and easily optimize mobile engagement," "improv[e] [user] retention," and "maximize … return on mobile investments."[79]

## V.    DEFENDANT KNOWINGLY DISCLOSES ITS USERS' PII TO THE THIRD PARTIES

99.    Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses to Braze, Amplitude, and Adobe, through the Braze, Amplitude, and Adobe APIs respectively, its users' personally identifiable information and video-viewing information.

100.    **Braze**. Defendant *intentionally* and *knowingly* discloses users' PII to Braze via the Braze API. During Braze's "Forge 2023" symposium, Myles Kleeger, Braze's President and Chief Commercial Officer spoke with Melissa Worthington, Senior Director of the NBA's CRM Lifecycle

---

[75] *Unique Processing Rules*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/unique-processing-rules.html.

[76] *Mobile App Analytics*, ADOBE EXPERIENCE CLOUD, https://business.adobe.com/products/analytics/mobile-app-analytics.html.

[77] *Id.*

[78] *Id.*

[79] *Id.*

Team, in a session entitled "Building a Winning Customer Engagement Program."[80]  Customer engagement was described as "becom[ing] table stakes for marketers."[81]

101.    Moreover, the symposium also featured Kevin Scheitrum, the NBA's Associate Vice President of Content Personalization and Optimization, to talk specifically about the NBA App and how Defendant implements strategic messaging within the user base.[82]

102.    Even more glaring, Defendant posted a job application for the position of CRM Growth Manager where it was stated in the required skills section that familiarity with "Braze is a plus."[83]

103.    ***Amplitude and Adobe***.  Defendant *intentionally* and *knowingly* discloses users' PII to Amplitude via the Amplitude API.  Defendant's website clearly states that Defendant uses "personal data for our marketing and advertising purposes, *as well as for our partners and other parties who advertise on our Online Services*."[84]

104.    On Defendant's website, Defendant confirms this usage of the Amplitude API for the purposes of analyzing user behavior, targeting marketing and advertising offerings, and ultimately retaining a larger user base. [85]  Indeed, Defendant's Privacy Policy states it uses personal data to "delivery location-based products and services," to "enhance and personalize fan experiences," to "compile, deidentify, or aggregate personal data for our business purposes," and for "analytical and research purposes, such as to better understand our fans and how they use the" Website.[86]

---

[80] *Building a Winning Customer Engagement Program*, BRAZE, https://www.braze.com/resources/webinars-and0events/building-a-winning-customer-engagement-program.

[81] *Id.*

[82] *How the NBA Uses Push Notifications to Celebrate History in the Making*, BRAZE (Jan. 4, 2024), https://www.braze.com/resources/articles/how-the-nba-uses-push-notifications-to-celebrate-history-in-the-making.

[83] CRM Growth Manager, EMAILJOBS, https://www.emailjobs.io/jobs/crm-growth-manager-at-national-basketball-association-nba/.

[84] *Privacy Policy,* NBA, https://www.nba.com/privacy-policy.

[85] *See Privacy Policy*, NBA, https://www.nba.com/privacy-policy#Data_Transfers.

[86] *Id.*

105.    Defendant's privacy policy further explains that personal data may be disclosed to third parties "to perform services for us on our behalf," including services "related to technology, communications, payment processing, advertising and marketing, analytics"[87] and more.

106.    Moreover, common sense dictates that a sophisticated media foundation like Defendant, who includes several data collection and analysis APIs and advertising platforms into its App, is fully aware of the scope of the data that these third parties are collecting.  This shows that Defendant is choosing to intentionally provide that data to Braze, Amplitude, and Adobe in order to obtain their analyzing, marketing, and advertising services.

VI.    **PLAINTIFFS' EXPERIENCES**

A.    **Plaintiff Whalen**

107.    In or about October 2023, Plaintiff Whalen downloaded the NBA App on his Apple iPhone.  Plaintiff Whalen subscribed to the League Pass Premium and created an NBA account for the purpose of accessing the NBA League Pass Premium.

108.    Plaintiff Whalen most recently watched a video within the NBA App in or around October 2024.  Through his NBA account, Plaintiff Whalen used the NBA App to watch various pre-recorded videos on his iPhone between October 2023 and October 2024.  Plaintiff Whalen used the same account on the NBA App to view videos throughout this period.

109.    Plaintiff Whalen regularly takes advantage of the benefits associated with his NBA account.  These benefits include but are not limited to: watching game previews, past seasons' final games, and game highlights.

110.    At all relevant times, Plaintiff Whalen never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties.

111.    Likewise, Defendant never gave Plaintiff Whalen the opportunity to prevent the App from disclosing his PII to third parties.

112.    Nevertheless, each time Plaintiff Whalen viewed a video on the NBA App, Defendant disclosed his PII to Braze via the Braze API.  Specifically, Defendant disclosed to Braze via the

---

[87] *Id.*

Braze API Plaintiff Whalen's: (i) e-mail address; (ii) user ID; and (iii) video-viewing information in the form of the video name and video ID for each specific video watched by Plaintiff Whalen. Using this information, Braze was able to identify Plaintiff Whalen and attribute his video viewing records to an individualized profile of Plaintiff Whalen in its databases. Indeed, even an ordinary person could identify Plaintiff Whalen using the data Defendant disclosed to Braze. Braze compiled Plaintiff Whalen's PII and activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

113.    In addition, every time Plaintiff Whalen viewed a video on the NBA App, Defendant disclosed his PII to Adobe via the Adobe API. Specifically, Defendant disclosed to Adobe via the Adobe API Plaintiff Whalen's: (i) email address, (ii) user ID, (iii) IDFA, and (iv) video-viewing information in the form of video name and video ID for each specific video watched by Plaintiff Whalen. Using this information, Adobe was able to identify Plaintiff Whalen and attribute his video-viewing records to an individualized profile of Plaintiff in its databases. Indeed, even an ordinary person could identify Plaintiff Whalen's PII and activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

**B.    Plaintiff Fuentes**

114.    In or about November 2022, Plaintiff Fuentes downloaded the NBA App on his Android mobile phone. Plaintiff Fuentes subscribed to the League Pass Premium and created an NBA account for the purpose of accessing the NBA League Pass Premium.

115.    Plaintiff Fuentes most recently watched a video within the NBA App in or around October 2024. Through his NBA account, Plaintiff Fuentes used the NBA App to watch various pre-recorded videos on his Android phone between November 2022 and October 2024. Plaintiff Fuentes used the same account on the NBA App to view videos throughout this period.

116.    Plaintiff Fuentes regularly takes advantage of the benefits associated with his NBA account. These benefits include but are not limited to: watching game previews, past seasons' final games, and game highlights.

117.    At all relevant times, Plaintiff Fuentes never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties.

118.    Likewise, Defendant never gave Plaintiff Fuentes the opportunity to prevent the App from disclosing his PII to third parties.

119.    Nevertheless, each time Plaintiff Fuentes viewed a video on the NBA App, Defendant disclosed his PII to Braze via the Braze API.  Specifically, Defendant disclosed to Braze via the Braze API Plaintiff Whalen's: (i) e-mail address; (ii) user ID; and (iii) video-viewing information in the form of the video name and video ID for each specific video watched by Plaintiff Fuentes.  Using this information, Braze was able to identify Plaintiff Fuentes and attribute his video viewing records to an individualized profile of Plaintiff Fuentes in its databases.  Indeed, even an ordinary person could identify Plaintiff Fuentes using the data Defendant disclosed to Braze.  Braze compiled Plaintiff Fuentes's PII and activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

120.    In addition, every time Plaintiff Fuentes viewed a video on the NBA App, Defendant disclosed his PII to Amplitude via the Amplitude API.  Specifically, Defendant disclosed to Amplitude via the Amplitude API Plaintiff Fuentes's: (i) geolocation (ii) AAID, and (iii) video-viewing information in the form of video name and video ID for each specific video watched by Plaintiff Fuentes.  Using this information, Amplitude was able to identify Plaintiff Fuentes and attribute his video-viewing records to an individualized profile of Plaintiff Fuentes in its databases.  Indeed, even an ordinary person could identify Plaintiff Fuentes's PII and activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

## THE PARTIES

121.    Plaintiff James Whalen is, and has been at all relevant times, a resident of Oakland, California and has an intent to remain there.  Plaintiff Whalen is therefore a citizen of California.

122.    Plaintiff Victor Fuentes is, and has been at all relevant times, a resident of San Leandro, California and has an intent to remain there.  Plaintiff Whalen is therefore a citizen of California.

123.    Defendant NBA Properties, Inc., is a New York corporation whose principal place of business is located at 645 Fifth Ave, New York, NY 10022.  Defendant develops, owns, and operates the NBA App, which is available for use throughout the United States and globally.

## JURISDICTION AND VENUE

124.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

125.    This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

126.    This Court also has specific personal jurisdiction over Defendant because the NBA App collected and disseminated users' personally identifiable information giving rise to this lawsuit in this California, and the conduct giving rise to this action arises out of and relates to that business. Defendant also heavily targets California in that four professional NBA teams—the Los Angeles Lakers, Los Angeles Clippers, Golden State Warriors, and Sacramento Kings—are based in California, and the App usage and disclosures on the App here are related to those activities.

127.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

128.    **Class Definition**: Plaintiff Whalen seeks to represent a class of similarly situated individuals defined as all persons in the United States who used the paid version of the NBA App to watch videos and had their PII transmitted to a third party (the "iOS Class").

129.    **Class Definition**: Plaintiff Fuentes seeks to represent a class of similarly situated individuals defined as all persons in the United States who used the paid version of the NBA Android App to watch videos and had their PII transmitted to a third party (the "Android Class").

130.    The iOS Class and the Android Class shall be collectively referred to as the "Class."

131.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

132.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's App and affiliated NBA videos, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

133.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      (a)    whether Defendant collected PII from Plaintiffs and the Class;

      (b)    whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

      (c)    whether Defendant's disclosures were committed knowingly; and

      (d)    whether Defendant disclosed Plaintiffs and the Class Members' PII without consent.

134.    **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, used the NBA App to watch videos, and consequently had their PII collected and disclosed to third parties by Defendant.

135.    **Adequacy (Fed. R. Civ. P. 23(a)(4))**:  Plaintiffs have retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Class and will

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to include Subclasses to address any steps that Defendant took.

136.    **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation Of The VPPA
### 18 U.S.C. § 2710

137.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

138.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

139.    Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its NBA App.

140.    Plaintiffs and Class Nembers are "consumers" as defined by the VPPA because they downloaded the App, created and paid for NBA accounts, obtained the benefits associated with

subscribing to the NBA League Pass, and subsequently watched pre-recorded videos through those accounts on the NBA App.  18 U.S.C. § 2710(a)(1).  Under the VPPA, this means that they were both "purchaser[s]" and "subscriber[s]" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).  What is more, because Plaintiffs and Class members were required to pay a monthly subscription fee for full access to the App's videos for that month, under the VPPA, they were also "renter[s]" of "goods or services from a video tape service provider."   18 U.S.C. § 2710(a)(1).

141.    In addition, through their creation of an account on Defendant's App, the purpose of which is to provide video content to users, Plaintiffs and Class Members provided additional information that was used to track them without their consent and received benefits in exchange, and therefore are "subscribers" because they registered, committed, and expressed association with the NBA App.

142.    Plaintiffs and Class Members viewed prerecorded video clips using the App.  During these occasions, the App disclosed Plaintiffs and Class Members' PII—including their e-mail addresses, geolocations, AAIDs, user IDs, IDFAs, and records of the videos that they viewed—to third party analytics companies including Braze, Amplitude, and Adobe.

143.    The App's transmissions of Plaintiffs and Class Members' PII to Braze and Amplitude constitutes "knowing[] disclosures" of their "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

144.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

145.    The information disclosed by the NBA App constitutes "personally identifiable information" in this context because it would allow an ordinary person—let alone the Third Parties— to identify Plaintiffs and the Class Members and which specific videos they viewed.

146.    Plaintiffs and Class Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

147.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, the App's disclosures to the Third Parties were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

148.    On behalf of themselves and the proposed Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the proposed Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the VPPA referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    For an award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses, as well as costs of suit.

1

## JURY DEMAND

2

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

3

4    Dated: January 31, 2025                    Respectfully submitted,

5                                               **BURSOR & FISHER, P.A.**

6                                               By: */s/ L. Timothy Fisher*
                                                        L. Timothy Fisher

7

8                                               L. Timothy Fisher (State Bar No. 191626)
                                                Stefan Bogdanovich (State Bar No. 324525)
                                                1990 N. California Boulevard, Floor 9

9                                               Walnut Creek, CA 94596
                                                Telephone: (925) 300-4455

10                                              Facsimile:  (925) 407-2700
                                                E-Mail: ltfisher@bursor.com

11                                                      sbogdanovich@bursor.com

12                                              *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28