VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JAMES Y. PAK (SBN 304563)
james.pak@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

MICHAEL W. McTIGUE JR. (*pro hac vice*)
michael.mctigue@skadden.com
MEREDITH C. SLAWE (*pro hac vice*)
meredith.slawe@skadden.com
ANDREW D. QUINN (*pro hac vice*)
andrew.quinn@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Defendant,
NBA Properties, Inc.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMES WHALEN and VICTOR FUENTES, individually and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBA PROPERTIES, INC.,<br><br>Defendant. | CASE NO.: 3:25-cv-01030-CRB<br><br>**DEFENDANT NBA PROPERTIES, INC.'S REPLY IN SUPPORT OF MOTION TO TRANSFER VENUE AND MOTION TO COMPEL INDIVIDUAL ARBITRATION**<br><br>**Date: July 11, 2025**<br>**Time: 10:00 a.m.**<br>**Place: Remote (Zoom)** |

# TABLE OF CONTENTS


Page

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 4

I. PLAINTIFFS HAD REASONABLY CONSPICUOUS NOTICE OF THE LEAGUE PASS SUBSCRIBER AGREEMENT WHEN THEY PURCHASED THEIR LEAGUE PASS SUBSCRIPTIONS AND MANIFESTED ASSENT TO THE TERMS OF USE ........ 4

A. A Reasonably Prudent Internet User Would Have Expected League Pass to Be Governed by An Agreement Given the Context of the Transaction ........ 5

B. The Visual Aspects of the Billing Info Page Provided Reasonably Conspicuous Notice of the Subscriber Agreement ........ 7

1. The Overall Context and Design of the Billing Info Webpage Provided Reasonably Conspicuous Notice of the Subscriber Agreement ........ 7

2. The Subscriber Agreement Hyperlink Is the First Sentence in a Paragraph Solely Dedicated to the League Pass Subscription, Directly Above the Operative Button ........ 9

3. The "Subscriber Agreement" Hyperlink Is Underscored and Set Apart from the Background, and Is the First Sentence Directly Above the "Agree and Subscribe" Button ........ 10

C. Plaintiffs Do Not Dispute That They Unambiguously Manifested Assent to the Subscriber Agreement, or That This Action Is Within the Scope of the Forum Selection Clause and Arbitration Agreement ........ 12

D. The Terms of Use Containing the Arbitration Agreement Were Clearly and Unequivocally Incorporated into the Subscriber Agreement ........ 12

E. The Email Notifying Plaintiff Fuentes of the 2023 Terms of Use Provided Adequate Notice; Plaintiff Fuentes Does Not Dispute Receiving or Opening the Email ........ 13

II. PLAINTIFFS DO NOT DISPUTE THAT THE FORUM SELECTION CLAUSE IN THE 2023 TERMS OF USE IS ENFORCEABLE AND APPLIES TO THIS ACTION ........ 15

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Atlantic Marine Construction Co. v. United States District Court for Western District of Texas*, 571 U.S. 49 (2013) ..... 15

*B.D. v. Blizzard Entertainment, Inc.*, 76 Cal. App. 5th 931 (2022) ..... 4, 12, 13

*Brooks v. WarnerMedia Direct, LLC*, No. 23 Civ. 11030 (KPF), 2024 WL 3330305 (S.D.N.Y. July 8, 2024) ..... 15

*Brown v. Madison Reed, Inc.*, No. 21-cv-01233-WHO, 2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) ..... 3, 9

*Burzdak v. Universal Screen Arts, Inc.*, No. 21-cv-02148-EMC, 2021 WL 3621830 (N.D. Cal. Aug. 16, 2021) ..... 10

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025) ..... 7

*Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002) ..... 15

*Dean v. OKCoin USA Inc.*, No. 24-cv-01331-PCP, 2024 WL 3522207 (N.D. Cal. July 23, 2024) ..... 4, 9, 11

*Driskill v. Experian Information Solutions, Inc.*, 753 F. Supp. 3d 839 (N.D. Cal. 2024) ..... 3, 9

*Edwards v. MUBI, Inc.*, No. 24-cv-00638-EKL, 2025 WL 985130 (N.D. Cal. Mar. 31, 2025) ..... 11

*Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911 (N.D. Cal. 2024) ..... passim

*Gill v. Chipotle Mexican Grill, Inc.*, 2025 WL 287320 (C.D. Cal. Jan. 23, 2025) ..... 11-12

*Godun v. JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025) ..... passim

*Herzog v. Superior Court*, 101 Cal. App. 5th 1280 (2024) ..... 11

*Holl v. United Parcel Service, Inc.*, No. 16-cv-05856-HSG, 2017 WL 11520143 (N.D. Cal. Sept. 18, 2017) ..... 4, 13

*Ireland-Gordy v. Tile, Inc.*,
760 F. Supp. 3d 946 (N.D. Cal. 2024) ........ 14

*Kamath v. Coinbase, Inc.*,
No. 23-cv-03533-CRB, 2024 WL 950163 (N.D. Cal. Mar. 5, 2024) ........ 14

*Keebaugh v. Warner Bros. Entertainment Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ passim

*Lopez v. Dave Inc.*,
No. 22-cv-04160-VC, 2022 WL 17089824 (N.D. Cal. Nov. 21, 2022), *aff'd*, No. 22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023) ........ 11

*Lopez v. Dave, Inc.*,
No. 22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023) ........ 11

*Massell v. SuccessfulMatch.com*,
718 F. Supp. 3d 1112 (N.D. Cal. 2024) ........ 11

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) ........ 15

*Meyer v. Uber Technologies, Inc.*,
868 F.3d 66 (2d Cir. 2017) ........ 2, 5, 8

*Morrison v. Yippee Entertainment, Inc.*,
756 F. Supp. 3d 842 (S.D. Cal. 2024) ........ 9, 10

*Murphy v. Schneider National, Inc.*,
362 F.3d 1133 (9th Cir. 2004) ........ 15

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 1, 4, 5, 6

*Perry-Hudson v. Twilio, Inc.*,
No. 24-cv-03741-VC, 2024 WL 4933332 (N.D. Cal. Dec. 2, 2024) ........ 3, 8, 10, 11

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) ........ 4, 11

*Pizarro v. QuinStreet, Inc.*,
No. 22-cv-02803-MMC, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) ........ 4, 9, 11

*Pliszka v. Axos Bank*,
No. 24-cv-445-RSH-SBC, 2024 WL 4194338 (S.D. Cal. Sept. 13, 2024) ........ 14

*Pronos v. SkyOne Federal Credit Union*,
No. 2:24-cv-03211-SVW-JC, 2024 WL 4799118 (C.D. Cal. Sept. 30, 2024) ........ 14, 15

*Ramirez v. Trusper, Inc.*,
No. 5:24-cv-02012-EJD, 2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) ........ 13

*Rocha v. Urban Outfitters, Inc.*,
No. 23-cv-00542-AMO, 2024 WL 393486 (N.D. Cal. Feb. 1, 2024) ........ 12

*Sadlock v. Walt Disney Co.*,
No. 22-cv-09155-EMC, 2023 WL 4869245 (N.D. Cal. July 31, 2023) ........ 10

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ........ 7

*Seneca v. Homeaglow, Inc.*,
No. 8:23-cv-02308-CJC-ADS, 2024 WL 750029 (C.D. Cal. Feb. 7, 2024),
*aff'd*, No. 24-887, 2025 WL 852896 (9th Cir. Mar. 19, 2025) ........ 2, 6, 10

*Serrano v. Open Road Delivery Holdings, Inc.*,
666 F. Supp. 3d 1089 (C.D. Cal. 2023) ........ 11

*Sifuentes v. Dropbox, Inc.*,
No. 20-cv-07908-HSG, 2022 WL 2673080 (N.D. Cal. June 29, 2022) ........ 14

*Tejon v. Zeus Networks, LLC*,
725 F. Supp. 3d 1351 (S.D. Fla. 2024) ........ 10

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) ........ 13

## SUMMARY OF ARGUMENT[1]

The facts relevant to these Motions are straightforward: Plaintiffs signed up for NBA League Pass subscriptions, were presented with the terms governing the subscriptions, clicked a button confirming their agreement to those terms, and now are bound by that agreement. Plaintiffs' Opposition (ECF No. 31), however, argues that a reasonably prudent user in Plaintiffs' position, after inputting payment information for an ongoing subscription, would somehow be unaware that this subscription is governed by the terms linked directly above a button stating "Agree and Subscribe." This argument runs counter to common sense and Ninth Circuit law holding that courts must engage in an objective, totality-of-the-circumstances inquiry that considers both the "context of the transaction" and "visual aspects of the notice" to determine whether a "reasonably prudent internet user—one who is likely often exposed to similar online agreements" would have been on notice of the agreement. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024). Applying that standard, there is no question that a reasonably prudent user in Plaintiffs' position was provided reasonably conspicuous notice of the Subscriber Agreement and the Terms of Use containing a forum selection clause and arbitration agreement that are prominently referenced in the Subscriber Agreement.

***First***, all of the circumstances of Plaintiffs' purchase of League Pass lead a reasonably prudent internet user, especially one who is likely often exposed to similar (and ubiquitous) online agreements, to expect that "their access to the platform would be continual and governed by some terms of use." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 926 (N.D. Cal. 2024). Plaintiffs allege they underwent a "full registration process" to subscribe to League Pass (Compl. ¶ 14) which clearly contemplates a continuing relationship that would put users on notice for a link to the terms of that relationship. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). Plaintiffs' mischaracterization of their subscription to League Pass as a "one-off" transaction is meritless. (Opp. at 5.)

***Second***, the visual aspects of the "Billing Info" page (ECF 28-1) provided conspicuous notice of the terms governing the subscription. Plaintiffs nitpick various stylistic aspects of the Billing Info page, but do not demonstrate how a reasonably prudent internet user would be unaware that they are agreeing to the terms

---

[1] Capitalized terms have the meaning ascribed to them in the NBA's Motion to Transfer Venue (ECF No. 26) and Motion to Compel Individual Arbitration (ECF No. 27) (collectively, the "Motions").

of the Subscriber Agreement. Nor could they, because the Billing Info page is presented in an easy-to-understand manner that is designed to draw the user's attention to the Subscriber Agreement hyperlink, located directly above the button stating "Agree and Subscribe." This uncluttered, sequentially ordered webpage relates to a single transaction: subscribing to League Pass. And it culminates in a paragraph presenting the terms that govern the ongoing relationship between the user and the NBA, the Subscriber Agreement and auto-renewal terms. The Subscriber Agreement hyperlink is "spatially coupled with the mechanism for manifesting assent—*i.e.*, the [Agree and Subscribe] button" and is "temporally coupled" with the pivotal action for the transaction: paying for the League Pass subscription. *Meyer v. Uber Techs.*, Inc., 868 F.3d 66, 78 (2d Cir. 2017) ("notice of the [Subscriber Agreement] is provided simultaneously to [purchasing the subscription], thereby connecting the contractual terms to the [subscription] to which they apply"). Notably, this all occurs on a page in which Plaintiffs enter their payment information and, as a case on which Plaintiffs heavily rely notes: "a consumer is far more likely to read every word on a page when that webpage requests particularly sensitive information, such as a credit card number." *Seneca v. Homeaglow, Inc.*, 2024 WL 750029, at *5 (C.D. Cal. Feb. 7, 2024) (cited Opp. pp. 7, 14). A reasonably prudent internet user navigating this page to pay for a League Pass subscription was provided reasonably conspicuous notice of the Subscriber Agreement governing the subscription.

Plaintiffs claim that the hyperlink to the Subscriber Agreement is "buried" in a lengthy paragraph and is "deemphasized" by other elements on the page. (Opp. at 2.) The argument is baseless. The hyperlink is contained in the first sentence of a paragraph, directly above a button stating: "Agree and Subscribe," deliberately drawing users' attention to the hyperlink. Plaintiffs also repeatedly mischaracterize the "Billing Info" page as "cluttered." (*Id.*) Not so. The Billing Info page is organized sequentially, with the user encountering each element as it relates to the next step of the transaction, with the hyperlinked Subscriber Agreement prominently placed where a reasonable user would expect such terms to be located: directly above the "Agree and Subscribe" button and after inputting payment information. Indeed, courts in this Circuit have repeatedly enforced terms contained in webpages that are less efficiently organized:[2]

[2] Plaintiffs wrongly suggest that the NBA was somehow mischaracterizing the webpage to the Court, even though the NBA submitted the page as a standalone exhibit. (Opp. at 2.) The "Order Summary" box containing the hyperlink to the Subscriber Agreement consumed the users' screen after they provided their sensitive payment information to the NBA, thereby drawing their attention to the hyperlink. (*Infra at* __.)




*Driskill v. Experian Info. Sols., Inc.*, 753 F. Supp. 3d 839, 842 (N.D. Cal. 2024)




*Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *1 (N.D. Cal. Aug. 15, 2022)




*Brown v. Madison Reed, Inc.*, 2021 WL 3861457, at *5 (N.D. Cal. Aug. 30, 2021)




ECF No. 28-1, League Pass "Billing Info" Page

Plaintiffs also argue that because the hyperlink was in the same color as the surrounding paragraph's text, it was not conspicuous. There is no bright line rule requiring hyperlinks to be a different color from surrounding text. Cases have held that underscoring or bolding text, even if the same color, is sufficient. *See, e.g.*, *Perry-Hudson v. Twilio, Inc.*, 2024 WL 4933332, at *1 (N.D. Cal. Dec. 2, 2024) ("[T]he Terms &

Conditions hyperlink provided reasonably conspicuous notice to" plaintiff where "links at issue here were not a different color from the rest of the text" but were underscored) (Chhabria, J.); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (rejecting plaintiff's argument that the "gray-on-gray" font was inconspicuous); *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (same); *Dean v. OKCoin USA Inc.*, 2024 WL 3522207, at *4 (N.D. Cal. July 23, 2024) (same).

***Third***, Plaintiffs do not dispute that the Terms of Use containing the arbitration agreement were clearly and unequivocally incorporated into the Subscriber Agreement. The 2022 Subscriber Agreement and the 2023 Subscriber Agreement both provided prominent notice and hyperlinks on the first or second page of those agreements that the subscription was governed by the dispute resolution provisions in the Terms of Use. There is no question that the Subscriber Agreement "clearly and unequivocally refers to the [Terms of Use] by name and calls it to the parties' attention." *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 952-53 (2022); *see also Holl v. United Parcel Serv., Inc.*, 2017 WL 11520143, at *5 (N.D. Cal. Sept. 18, 2017).

***Fourth***, Defendants have provided evidence that Plaintiff Fuentes in fact **received** the February 2023 Notice Email notifying him of the updated 2023 Terms of Use. It is Fuentes' burden to show that he did not receive or open the February 2023 Notice Email. He has provided no such evidence and, therefore, under well-settled law, he is bound by the 2023 Terms of Use. Further, Plaintiffs do not dispute that if this Court holds that they are bound by the 2023 Terms of Use, the forum selection clause applies to this Action.

For the foregoing reasons, the Court should hold that Plaintiffs are bound by the forum selection clause in the 2023 Terms of Use and grant Defendant's motion to transfer venue to the U.S. District Court for the Southern District of New York.

## ARGUMENT

### I. PLAINTIFFS HAD REASONABLY CONSPICUOUS NOTICE OF THE LEAGUE PASS SUBSCRIBER AGREEMENT WHEN THEY PURCHASED THEIR LEAGUE PASS SUBSCRIPTIONS AND MANIFESTED ASSENT TO THE TERMS OF USE

In assessing whether a consumer was provided reasonably conspicuous notice of an online agreement, courts must conduct a "fact-intensive inquiry" under an "objective, totality-of-the-circumstances standard." *Oberstein*, 60 F.4th at 514. In doing so, courts consider both the "context of the transaction" and "visual aspects of the notice" to determine whether a "reasonably prudent internet user—one who is likely often exposed to similar online agreements" would have been on notice of the agreement. *Keebaugh*, 100

F.4th at 1019-20. Here, both the context of Plaintiffs' transaction and the visual aspects on the "Billing Info" page show that a reasonably prudent internet user in Plaintiffs' position would have been on notice of the Subscriber Agreement.

### A. A Reasonably Prudent Internet User Would Have Expected League Pass to Be Governed by An Agreement Given the Context of the Transaction

Plaintiffs mischaracterize their subscriptions to League Pass as a "one-off" transaction. On the contrary, their subscription to the NBA's streaming service is exactly the type of paid, ongoing relationship that courts have held a reasonably prudent internet user would expect to be governed by an agreement. The "context of the transaction" test considers whether the "type of transaction contemplates entering into a continuing, forward-looking relationship[] governed by terms and conditions." *Keebaugh*, 100 F.4th at 1017 (citation omitted). Courts contrast transactions like "noncommittal free trial[s]" with transactions, like League Pass, that require "a full registration process," and reflect "the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517 (citation omitted). Courts likewise consider whether "a user enters 'credit card information'" in this analysis. *Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78, 80 (2d Cir. 2017)).

*Ghazizadeh* is instructive. There, the court held that "users of [defendant's] services, a platform that offers online educational courses via pre-recorded videos, would similarly expect (or should expect) their access to the platform would be continual and governed by some terms of use." 737 F. Supp. 3d at 926. The court reasoned that plaintiff's "access to [defendant's] services 'until deleted carrie[d] the connotation that the user [would] also have ongoing access to that app unless something material change[d].' . . . users of a service like [defendant's knew] that they [could] continue to access [defendant's] recorded videos." *Id.* at 925-26 (quoting *Keebaugh*, 100 F.4th at 1020).

Here, all of the surrounding circumstances of Plaintiffs' purchase of League Pass lead a reasonably prudent internet user, especially "one who is likely often exposed to similar online agreements," to expect his or her subscription to be continual and governed by some terms of use. *Keebaugh*, 100 F.4th at 1019. Plaintiffs themselves allege that they (i) "created an NBA account for the purpose of accessing the NBA League Pass Premium," (ii) used their League Pass subscription to "watch pre-recorded videos" on their

devices between October 2023 and October 2024 (Whalen) or November 2022 and October 2024 (Fuentes), and (iii) "regularly take[] advantage of the benefits associated with" their League Pass subscription. (Compl. ¶¶ 107-109, 114-16.) *See Ghazizadeh*, 737 F. Supp. 3d at 926 ("Plaintiff's complaint underscores the ongoing nature of [defendant's] services. Plaintiff states that he 'has consistently viewed videos on [defendant's website] in order to complete various certificate programs.'"). Plaintiffs also allege that "[t]o pay for an NBA League Pass, individuals must first have an 'NBA ID,'" and the NBA ID "requires user to provide Defendant with their first name, last name, and e-mail address in the sign-up process." (Compl. ¶ 14.) This "full registration process . . . reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517. Plaintiffs also rely on and cite to the NBA's Privacy Policy to support their VPPA allegations, further demonstrating that they understood that their relationship with the NBA would be governed by some agreement. (*See* Compl. ¶¶ 104-105, nn.84-87; *see, e.g.*, *id.* ¶ 117 ("Plaintiff Fuentes never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties.").) Finally, the location of the hyperlink to the Subscriber Agreement is on the same page on which Plaintiffs input their credit card information. As noted in a case Plaintiffs cite: "As a practical matter, **a consumer is far more likely to read every word on a page when that webpage requests particularly sensitive information, such as a credit card number, than in other contexts**." *Seneca*, 2024 WL 750029, at *5. In sum, a League Pass subscription is far afield from the "noncommittal free trials" in which a user might reasonably expect to not be bound by a subscriber agreement.

Plaintiffs' contention that their subscription is merely a "one time" purchase is meritless. For one thing, Plaintiffs had ongoing access to NBA videos after they purchased their League Pass, which a reasonably prudent user would realize was subject to ongoing terms. Moreover, Plaintiffs concede that the Billing Info page informed Plaintiffs that "the subscription will automatically renew." Plaintiffs argue that "this alone is not enough" because "it must be clear that consumers agree not only to the one-time purchase, but also to the continuing purchases going forward." (Opp. at 5-6 (quoting *Godun*, 135 F.4th at 712).) The advisal on the Billing Info page makes that clear. It states: "a season-long subscription will renew the month prior to the following season, and annually thereafter at the latest subscription rates. You will be charged the total amount due per applicable billing cycle unless you cancel." (ECF No. 28-1; ECF No. 28 ("Decl.") ¶ 7.)

Plaintiffs therefore did agree to "purchases going forward" and made such purchases by continuing their subscriptions to League Pass beyond the initial year for which they signed up. (*See* Decl. ¶ 26 (Plaintiff Whalen's subscription has lasted continuously from October 2023 to February 2025); Compl. ¶ 115 (Plaintiff Fuentes's subscription has lasted from November 2022 and October 2024).)

Finally, Plaintiffs' reliance on *Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025), is misplaced. There, three separate webpages "advised [users] that they are 'never locked in,' that there [were] 'no commitments,' and that they [could] 'cancel anytime.'" *Id*. at 1155. Likewise, "[t]he user [did] not create a username or password and [was] not asked to make an account." Instead, the "'offer' [was] for '1 month,' [] the user purchase[d] '45 credits' to be traded in for classes[, and the] user conclude[d] the transaction by 'redeeming' that offer." *Id*. The court, therefore, held that "[t]he transaction could easily be considered a one-time purchase of credits at a discounted rate to be traded in at gyms and studios, rather than the formation of an ongoing relationship with [defendant]." *Id*. Here, Plaintiffs concede that they registered their personal information with the NBA to purchase the League Pass and accessed NBA videos over an extended period. Their transaction with the NBA bears no similarities to the "one-time purchase of credits at a discounted rate" at issue in *Chabolla*.[3]

## B. <u>**The Visual Aspects of the Billing Info Page Provided Reasonably Conspicuous Notice of the Subscriber Agreement**</u>

### 1. <u>The Overall Context and Design of the Billing Info Webpage Provided Reasonably Conspicuous Notice of the Subscriber Agreement</u>

Considering the totality of the circumstances, the NBA's hyperlinked, underlined notice placed directly above a button stating "Agree and Subscribe" provides reasonably conspicuous notice to a reasonably prudent internet user. The Ninth Circuit has "discussed certain factors relevant to our visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)." *Godun*, 135 F.4th at 709. Nevertheless, there is no

[3] *Godun* is similarly inapposite. That case involved six plaintiffs, one of whom, Davis, was presented with an "advisal" on a payment page that merely stated, "Try 7 days for $5. Then $28/mo. Cancel anytime. We'll remind you before trial ends." 135 F.4th at 704, 707. *Godun* cited *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021), explaining that "*Sellers* considered not only this sort of transaction, but a near-identical transaction involving the same website and subscription." *Godun*, 135 F.4th at 712. *Sellers* held that "Plaintiffs were offered a $5 'trial'" and, therefore, "did not anticipate that they would enter into an ongoing relationship governed by extensive contractual terms simply because they submitted a single question for a 'trial' and a one-time fee of $5." *Sellers*, 73 Cal. App. 5th at 477.

"checklist for website designers" nor are there any "per se design rules that must be followed for a contract to be formed between a website user and provider." *Id.* at 710. Ultimately, when undertaking this inquiry, "courts must be tuned to the expectations of a reasonably prudent internet user" and a "hefty dose of common sense goes a long way." *Id.* Indeed, "as the Ninth Circuit has said in later cases, reasonably conspicuous notice requires looking at the context of the overall design and content of the website." *Perry-Hudson*, 2024 WL 4933332, at *1 (Chhabria, J.) (citing *Keebaugh*, 100 F.4th at 1020-21).

The Billing Info page is presented in a balanced, easy-to-follow manner that: (i) first presents the user with other options for subscribing to League Pass and any potential promotions, (ii) then allows the user to choose a form of payment followed by fields for inputting sensitive credit card information, and (iii) finally, at the conclusion of the transaction, presents an underlined hyperlink to the Subscriber Agreement in the first sentence of a paragraph that also discloses auto-renewal terms, presented directly above a button that states "Agree and Subscribe." The uncluttered, sequentially ordered webpage all relates to a subscription to League Pass. And it culminates in a paragraph presenting the terms that govern the ongoing relationship between the user and the NBA, the Subscriber Agreement and auto-renewal terms (which are required disclosures by law). Accordingly, the Subscriber Agreement hyperlink is "spatially coupled with the mechanism for manifesting assent—i.e., the [Agree and Subscribe] button" and is "temporally coupled" with the pivotal action for the transaction: paying for the League Pass subscription. *Meyer*, 868 F.3d at 78 ("notice of the [Subscriber Agreement] is provided simultaneously to [purchasing the subscription], thereby connecting the contractual terms to the [subscription] to which they apply").

Plaintiffs' assertion that the NBA used a screenshot of the "Order Summary" box at the end of the webpage on the "belief that the Court would be unable to locate the Terms without some extra emphasis" (Opp. at 2, 11) is false. (Opp. at 2.) As the Supplemental Declaration of Kenneth Ebanyat ("Supp. Decl.," filed herewith) explains, the Billing Info page fills the entire screen of the user's browser. (Suppl. Decl. ¶ 4.) Exhibit 1 to the Ebanyat Declaration (ECF No. 28-1) was necessarily formatted to fit all of the content onto one page for the Court. (Suppl. Decl. ¶ 3.) Reply Exhibit 1 shows what a user sees as of today, which is substantially similar to what Plaintiffs saw on the dates they purchased their League Passes. The "Order Summary" box containing the hyperlink to the Subscriber Agreement consumed the users' screen after they provided their sensitive payment information to the NBA, thereby drawing their attention to the hyperlink.

(Reply Ex. 1 at 2.) *See Dean*, 2024 WL 3522207, at *4 (hyperlink provided conspicuous notice where "[a] reasonable consumer would understand, in creating a cryptocurrency trading account and then depositing a substantial sum of money with the account provider, that the relationship would be governed by contractual terms of some kind," where "the hyperlinked text through which [plaintiff] could have accessed [defendant's] Terms of Service was not presented in a different color from the other text" and was bolded).

2. The Subscriber Agreement Hyperlink Is the First Sentence in a Paragraph Solely Dedicated to the League Pass Subscription, Directly Above the Operative Button

Plaintiffs argue that the Subscriber Agreement hyperlink is "buried in eleven" lines of text and take issue with the fact that it is the first sentence of the advisal also informing Plaintiffs of the auto-renewal terms above the "Agree and Subscribe" button. (Opp. at 6-7.) However, the fact that the page discloses other important information does not undermine the sufficiency of the disclosure of the Subscriber Agreement, and courts regularly enforce agreements with similar presentations. In *Driskill v. Experian Information Solutions, Inc.*, 753 F. Supp. 3d 839, 842, 844 (N.D. Cal. 2024), for example, the court held that a hyperlink to the Terms of Use located in the middle of a 15-line paragraph that contained three other hyperlinks relating to other aspects of the transaction provided reasonable notice of the terms, characterizing the hyperlink as being "immediately above" the button stating "Create Your Account." In *Brown v. Madison Reed, Inc*., 2021 WL 3861457, at *5 (N.D. Cal. Aug. 30, 2021), likewise, the court held that a joint hyperlink to terms and a privacy policy contained in an 8-line paragraph concerning the transaction above a "Place Order" button provided adequate notice. In *Pizarro*, 2022 WL 3357838, at *3, the underlined hyperlink to the terms was in a 20-line paragraph and in the same font as the surrounding text. The court concluded the hyperlink was reasonably conspicuous "when viewed in the context of the overall design and content of the webpage" and was "adequately contrasted with the white background." (*See supra* at 3 for snip of pages in *Driskill*, *Brown*, and *Pizarro*.) As in each of these cases, the Subscriber Agreement hyperlink here is directly above the "Subscribe and Agree" button and included in a paragraph containing other information relating to the transaction.

The cases Plaintiffs rely on do not show otherwise. In *Morrison v. Yippee Entertainment, Inc.*, 756 F. Supp. 3d 842, 848 (S.D. Cal. 2024), the webpage was not presented in a sequential, balanced visual display. Instead, "the page contain[ed] promotional material displaying emoticon illustrations and self-

promotional statements, which [drew] a viewer's attention away from the hyperlink." *Id.* at 850. The inclusion of "a second hyperlink with the same name and similar placement as the one in question only further [drew] the viewer's attention." *Id.* In *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *11 (N.D. Cal. July 31, 2023), the court did not assess the context of the transaction in concluding the hyperlink to the terms was not reasonably conspicuous. Regardless, the court ultimately held that there "was undisputedly an agreement of some kind between [plaintiff] and [defendant] based on his purchase of the subscription service" and granted the defendant's motion to compel arbitration. *Id.* at *12-13. In *Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1355-56 (S.D. Fla. 2024), the webpage "provide[d] a link to a separate webpage with terms and conditions and [did] not require the user to click an acknowledgment." The court reasoned that "the hyperlinks [were] placed beneath, rather than above" buttons, which did not relate to the operative button requiring action by the user. Similarly, *Seneca* turned on the fact that the terms were presented only **after** the user paid for the service at issue, and reasoned "[a]t this point in the transaction, [defendant had] accepted the consumer's payment for a cleaning voucher and [had] retained the consumer's credit card information to charge the monthly fee for the [service]." 2024 WL 750029, at *4. Here, the Subscriber Agreement is presented at the same time payment information is provided and the transaction is completed.[4]

3. <u>The "Subscriber Agreement" Hyperlink Is Underscored and Set Apart from the Background, and Is the First Sentence Directly Above the "Agree and Subscribe" Button</u>

Plaintiffs next argue that (i) the hyperlink is not displayed in a different color, (ii) it is in purportedly "tiny" font that does not stand out from the "clutter" of the page, and (iii) is not located directly above the "Agree and Subscribe" button. These arguments fail.

**Font Color and Placement Above "Agree and Subscribe" Button**. Courts have repeatedly held that hyperlinks that are underscored but "not a different color from the rest of the text" provide reasonable notice where the "the context of the overall design and content of the website" otherwise demonstrates that a reasonably prudent internet user would have seen it. *Perry-Hudson*, 2024 WL 4933332, at *1 ("the Terms & Conditions hyperlink provided reasonably conspicuous notice to" where "links at issue here were not a

---

[4] *Burzdak v. Universal Screen Arts, Inc.*, 2021 WL 3621830, at *2-5 (N.D. Cal. Aug. 16, 2021) is likewise irrelevant: the page at issue did not "clearly and explicitly inform[] that by clicking the subject boxes, the reader" would be bound by the terms, and the page was presented "as part of a post-purchase process."

different color from the rest of the text" but were underscored) (Chhabria, J.); *Peter*, 445 F. Supp. 3d at 586 (rejecting plaintiff's argument that the "gray-on-gray" font was inconspicuous); *Pizarro*, 2022 WL 3357838, at *3 (conspicuous notice provided where "the instant hyperlink, although the same color as the rest of the textual notice, [was] underlined and adequately contrasted with the white background"); *Dean*, 2024 WL 3522207, at *4 (hyperlink provided conspicuous notice where "[a] reasonable consumer would understand, in creating a cryptocurrency trading account and then depositing a substantial sum of money with the account provider, that the relationship would be governed by contractual terms of some kind," where "the hyperlinked text through which [plaintiff] could have accessed [defendant's] Terms of Service was not presented in a different color from the other text").

Here, the Subscriber Agreement is in a font color that is offset from the white background, underlined, and appears in a paragraph that is located directly above the "Agree and Subscribe" button. Such a presentation provides reasonable notice. *See Pizarro*, 2022 WL 3357838, at *3; *Perry-Hudson*, 2024 WL 4933332 at *1 ("although the links are merely underscored," "the black font color serves as a contrast to the plain white background").

*Herzog v. Superior Court*, 101 Cal. App. 5th 1280, 1286 (2024), is irrelevant because the defendant there "undid whatever notice it might have provided of the contractual terms by explicitly telling the user that clicking the box constituted authorization for Dexcom to collect and store the user's sensitive, personal health information" instead of telling the user that they would be bound by the terms. Here, Plaintiffs do not, and cannot, dispute that they were explicitly informed that "By clicking 'Subscribe' you acknowledge that you have read and agree to the Subscriber Agreement."[5]

---

[5] Plaintiffs' other cases are equally inapposite. In *Lopez v. Dave, Inc.*, 2023 WL 8594393, at *2 (9th Cir. Dec. 12, 2023), the district court did not examine "the full context of the relationship," as *Keebaugh* instructs. Further, the hyperlink was located below the operative button, indicating that a user would not have naturally encountered the hyperlink before signing up. *See Lopez v. Dave Inc.*, 2022 WL 17089824, at *2 (N.D. Cal. Nov. 21, 2022). Similarly, in *Serrano v. Open Road Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096-97 (C.D. Cal. 2023), the hyperlink was beneath the operative button signaling assent and "separated by larger and darker text addressing users with existing accounts," and it was not clear that "Plaintiff should have expected to be bound by an arbitration agreement based on the nature of the account for which he signed up." *Edwards v. MUBI, Inc.*, 2025 WL 985130, at *7 (N.D. Cal. Mar. 31, 2025), involved a hyperlink presented on a page offering a free trial. The court concluded: "It is not clear whether Plaintiffs initially signed up for the free trial and were automatically enrolled after the trial ended, or whether Plaintiffs intended to subscribe to MUBI from the outset. The former scenario suggests that Plaintiffs did not expect a continuing relationship." *Massell v. SuccessfulMatch.com*, 718 F. Supp. 3d 1112 (N.D. Cal. 2024), and

*(cont'd)*

**The Billing Info Page Is Not Cluttered**. As noted *supra* Part I.B.1, the Billing Info page is not cluttered. Instead, it is presented on a balanced, sequentially ordered webpage with all information relating to a subscription to League Pass. It culminates in a paragraph in the same, legible font presenting the terms that govern the ongoing relationship between the user and the NBA, the Subscriber Agreement and auto-renewal terms. Plaintiffs' cases demonstrate the difference between the Billing Info page and so-called "cluttered" webpages. In *Rocha v. Urban Outfitters, Inc.*, 2024 WL 393486, at *5 (N.D. Cal. Feb. 1, 2024), the page was not presented in a sequential manner and contained "other clickable boxes such as an option to opt-in to receive text messages" not present on the Billing Info page here. Moreover, unlike here, *Rocha* involved a one-off purchase that did not require registration or indicate an ongoing relationship.

### C. <u>Plaintiffs Do Not Dispute That They Unambiguously Manifested Assent to the Subscriber Agreement, or That This Action Is Within the Scope of the Forum Selection Clause and Arbitration Agreement</u>

Plaintiffs notably do not dispute that if they were provided reasonable notice (which they were), they manifested assent by clicking "Agree and Subscribe." Nor do they dispute that their VPPA claims fall within the scope of the forum selection clause or arbitration agreement in the Terms of Use. Thus, Plaintiffs have conceded these elements.

### D. <u>The Terms of Use Containing the Arbitration Agreement Were Clearly and Unequivocally Incorporated into the Subscriber Agreement</u>

Plaintiffs do not dispute that the Terms of Use containing the arbitration agreement were clearly and unequivocally incorporated into the Subscriber Agreement. Instead, they argue that the notice of the Terms of Use within the Subscriber Agreement was not "reasonably conspicuous." This argument fails. "The general rule is that the terms of an extrinsic document may be incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties." *B.D.*, 76 Cal. App. 5th at 952-53 (citation omitted).

Here, the 2022 Subscriber Agreement to which Plaintiff Fuentes agreed upon subscribing to League

---

*Gill v. Chipotle Mexican Grill, Inc.*, 2025 WL 287320 (C.D. Cal. Jan. 23, 2025), evaluated the color of the hyperlink in a vacuum, thereby ignoring the Ninth Circuit's admonishment to review the overall design of the website and context of the transaction. *See Keebaugh*, 100 F.4th at 1018; *Godun*, 135 F.4th at 710 (9th Cir. 2025) ("Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis.").

Pass incorporated the Terms of Use on the first page, and contained a blue hyperlink to the Terms of Use on the second page with the statement that "your subscription and use of the Service" is subject to the Terms, including the Terms' clauses titled "AGREEMENT TO ARBITRATE." (ECF No. 28-2 at 2.) The 2023 Subscriber to which Plaintiff Whalen agreed upon subscribing to League Pass, on the first page, contained four blue hyperlinks to the 2023 Terms of Use, and clearly stated, "THIS SUBSCRIBER AGREEMENT INCORPORATES BY REFERENCE AN ARBITRATION AGREEMENT." (ECF No. 28-5 at 1.) The Subscriber Agreement "clearly and unequivocally refers to the [Terms of Use] by name and calls it to the parties' attention." *B.D.*, 76 Cal. App. 5th at 952-53. Plaintiffs' failure "to read a contract in full does not excuse a party from being bound by its contents." *Holl*, 2017 WL 11520143, at *5 (plaintiff bound by arbitration agreement that was incorporated by reference into a clickwrap agreement, even though "users [were] not provided with a hyperlink [to the terms containing the arbitration agreement], but instead [were] directed to navigate to ups.com").

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1214 (9th Cir. 2019), is inapposite because the defendant did not "require users to affirmatively acknowledge or agree to the Terms before downloading or while using the app." The only two ways to view the terms, neither of which were required to use the app (unlike here), were to read "the Terms before downloading the app" or "viewing the Terms during game play." Both presentations, the court observed, "would need Sherlock Holmes's instincts to discover the Terms." Here, the user only needs to click on the Subscriber Agreement link to find the Terms of Use referenced and linked on the first page (2023 Subscriber Agreement) or second page (2022 Subscriber Agreement).[6]

### E. <u>The Email Notifying Plaintiff Fuentes of the 2023 Terms of Use Provided Adequate Notice; Plaintiff Fuentes Does Not Dispute Receiving or Opening the Email</u>

Plaintiffs fail to show that Plaintiff Fuentes did not receive email notice of the 2023 Terms of Use. Plaintiff Fuentes **does not** introduce any record evidence stating that he never or read received the February 2023 Notice email providing conspicuous notice of the 2023 Terms of Use. The NBA, conversely, has

---

[6] *Ramirez v. Trusper, Inc.*, 2024 WL 4479862, at *6 (N.D. Cal. Oct. 11, 2024), also does not help Plaintiffs. There, the court concluded "it is unreasonable to expect an internet user to comprehend the circuitous path involving selecting a hyperlink labeled 'Telehealth Consent,' to reach another page with a hyperlink labeled 'terms page,' only to reach a page with a completely different title, 'Participation Agreement,' where they [would] find the terms of their agreement." Here, there is no dispute that each agreement was clearly labeled, and the paths to the Terms of Use were easy to follow.

established that on February 23, 2023, Fuentes in fact received an email notifying him of the updated 2023 Terms of Use at the email address associated with his NBA account and, after receiving this email, he proceeded to access League Pass on the NBA App on 15 different days. (Decl. ¶ 30.) *See Pronos v. SkyOne Fed. Credit Union*, 2024 WL 4799118, at *3 (C.D. Cal. Sept. 30, 2024) ("Under California law, if a party shows that a letter was mailed, a rebuttable presumption arises that it was received.").

Plaintiff Fuentes states that "[c]ourts in this Circuit have held that it is insufficient proof of inquiry notice for a defendant to merely show that it sent out an email to a plaintiff informing them of updates to legal terms and that the plaintiff continued to use the services afterwards." (Opp. at 13.) However, in each of the cases Fuentes cites, the plaintiff provided evidence disputing that they ever agreed to arbitrate, opened the email notice at issue, or received the email notice.[7] Fuentes submitted no such evidence here.

*Ghazizadeh* is again on point. There, "[w]hile arguing that [defendant] has not demonstrated that [the plaintiff] received the email" the plaintiff did not contend that he did not receive the email either, and the defendant, conversely, "supplied evidence that it sent the notice email to [the plaintiff's] email address." 737 F. Supp. 3d at 933; *see id.* at 933-34 ("Plaintiff's consent to the [original agreement], which contained a 'continuing use' provision, combined with Plaintiff's continued use of Coursera's services, [was] sufficient to demonstrate manifestation of consent to the updated terms sent directly to the email address Plaintiff had on file with [defendant]"); *accord Kamath v. Coinbase, Inc.*, 2024 WL 950163, at *4 (N.D. Cal. Mar. 5, 2024) (Breyer, J.) ("The email [notifying plaintiff of the updated terms] and Plaintiff's continued use of [defendant's] services is enough to establish reasonably conspicuous notice and assent to the [updated terms]").

Here, the record evidence is not in dispute: (i) Fuentes in fact received the February 2023 Notice Email that provided a hyperlink to the 2023 Terms of Use, informed him that the updated terms included "information about procedures for resolving disputes" and advised that his "continued use of our websites

---

[7] *See Sifuentes v. Dropbox, Inc.*, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022) ("Plaintiff denies that he ever agreed to arbitrate, read any updated terms of service, or opened any emails from Defendant about these issues"); *Ireland-Gordy v. Tile, Inc.*, 760 F. Supp. 3d 946, 955 (N.D. Cal. 2024) ("Both [plaintiffs] attest in declarations that they 'never knew that [defendant] sent a notice that it updated its Terms of Service in October 2023'"); *Pliszka v. Axos Bank*, 2024 WL 4194338, at *6 (S.D. Cal. Sept. 13, 2024) ("absent evidence that Plaintiff acknowledged receiving the change-of-terms e-mail, the Court declines to conclude that Plaintiff manifested his intent to use silence as a means of acceptance").

and mobile apps" constitute acceptance and (ii) continued to use the NBA App and League Pass in the 30 days following his receipt of the email on February 23, 2023. (Decl. ¶¶ 30-31.) Moreover, Fuentes was allowed 30 days to opt out of the arbitration agreement in the 2023 Terms of Use, and did not do so. (*Id.* ¶ 33.) *See Pronos*, 2024 WL 4799118, at *3 ("if Plaintiff did receive notice of the Arbitration Provision, the opt-out clause, taken together with Plaintiff's continued use of her account and silence about the Arbitration Provision, would necessitate a finding that the parties had agreed to arbitrate on an individual basis").

The NBA also provided ample consideration for the 2023 Terms of Use, given that both Plaintiff Fuentes and the NBA obtained "new dispute resolution rights." *Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *16 (S.D.N.Y. July 8, 2024) (updated arbitration agreement provided adequate consideration). The mutual promise to agree to arbitrate under these new terms, alone, "serves as adequate consideration." *Cir. City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002).

## II. PLAINTIFFS DO NOT DISPUTE THAT THE FORUM SELECTION CLAUSE IN THE 2023 TERMS OF USE IS ENFORCEABLE AND APPLIES TO THIS ACTION

Plaintiffs merely assert that the forum selection clause is "unenforceable for lack of notice" and then, citing one public interest factor—that another case involving the NBA's affiliate is pending in this district—claim that "NBA's cited grounds do not justify transfer." (Opp. at 14.) This argument falls well short of the "heavy burden" Plaintiffs face in showing that public interest factors demonstrate that enforcing the forum selection clause would be unreasonable or unjust. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004). Accordingly, Plaintiffs do not demonstrate that this Action is the "unusual case[]" in which the forum selection clause should not be enforced. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 64 (2013).[8]

## CONCLUSION

For the reasons above, the NBA respectfully requests that the Court grant the NBA's motion to transfer to the Southern District of New York, and if it does not, grant the NBA's motion to compel arbitration.

---

[8] As Plaintiffs concede, any challenge to enforceability of the NBA's arbitration agreement can only be heard in the Southern District of New York. (Opp. at 15.) In any event, any such challenge will fail: courts have upheld substantially identical arbitration agreements.

DATED: June 16, 2025

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *Virginia F. Milstead*
Virginia F. Milstead

VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JAMES Y. PAK (SBN 304563)
james.pak@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

MICHAEL W. McTIGUE JR. (*pro hac vice*)
michael.mctigue@skadden.com
MEREDITH C. SLAWE (*pro hac vice*)
meredith.slawe@skadden.com
ANDREW D. QUINN (*pro hac vice*)
andrew.quinn@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Defendant,
NBA Properties, Inc.