IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WHALEN and VICTOR FUENTES, individually and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBA PROPERTIES, INC.,<br><br>Defendants. | Case No. 25-cv-01030-CRB<br><br>**ORDER GRANTING MOTION TO TRANSFER** |

Plaintiffs James Whalen and Victor Fuentes are the named class members in a potential class action against Defendant NBA Properties, Inc. Compl. (dkt. 1). NBA requests this Court either transfer this case to the Southern District of New York pursuant to a forum selection clause or, alternatively, send the parties to arbitration based on an arbitration clause within the same contract. See Mot. to Transfer (dkt. 26); Mot. to Compel (dkt. 27). Plaintiffs oppose both requests, insisting that they never formed a contract with NBA. Opp. (dkt. 31) at 7. The Court finds that the contracts are enforceable and GRANTS NBA's motion to transfer, leaving the issue of arbitration for the Southern District of New York.

I. **BACKGROUND**

   A. **Factual Background**

      1. **League Pass**

League Pass is a paid subscription that NBA offers where subscribers can livestream games, watch prior games, and access exclusive content. Ebanyat Decl. (dkt. 28) ¶¶ 3–4. Subscribers purchase access to League Pass either monthly or annually. Id.

¶ 4. Subscribers can access content through NBA's website, a smart TV app, or the NBA: Live Games & Stores app. Id. ¶ 5.

To subscribe, customers must create an NBA account. Id. ¶ 4. Customers are then presented with a billing info page asking for a method of payment. Id. ¶ 7. An order summary box is located at the bottom of the page. Id.

An advisory sits directly above the "Agree and Subscribe" button outlining the subscription's automatic renewal. Id. It clearly warns users, "By clicking 'Agree and Subscribe' you acknowledge that you have read and agree to the Subscriber Agreement." Id. The underlined terms are a hyperlink to a webpage titled Subscriber Agreement for NBA League Pass and NBA TV (located at http://www.nba.com/subscriberagreement). 2022 Subscriber Agreement (dkt. 28-2) at 2; see also 2023 Subscriber Agreement (dkt. 28-5) at 2.

At all relevant times, the subscriber agreement hyperlink took consumers to the most up-to-date version of the subscriber agreement for NBA League Pass and NBA TV. Ebanyat Decl. ¶¶ 10, 20. From November 2022 until June 2023, the operative subscriber agreement included the following provision:

> You agree to the Site Terms of Use (the "Terms"), posted at https://nba.com/termsofuse and the NBA.com Network Privacy Policy, posted at https://nba.com/privacypolicy. We may change the Terms and/or the Privacy Policy from time to time. To the extent of any conflict between the terms or conditions of this Agreement and the terms or conditions of the Terms and/or Privacy Policy, the terms and conditions of this Agreement will govern. ***Without limiting the generality of the foregoing, you acknowledge that you have read and agree to the Terms and the Privacy Policy, and you understand that your subscription and your use of the Service is subject to the Privacy Policy and the Terms, including, without limitation, the Terms' clauses titled "DISCLAIMER OF WARRANTIES AND DAMAGES; LIMITATION OF LIABILITY", "AGREEMENT TO ARBITRATE", and "CLASS ACTION WAIVER".***

2022 Subscriber Agreement at 1–2. This agreement (the 2022 Subscriber Agreement) included two hyperlinks, indicated by blue font, bringing users to NBA.com's current terms of use and privacy policy webpages. Ebanyat Decl. ¶¶ 12, 13. The 2022 Subscriber

1   Agreement purported to incorporate the 2021 Terms of Use, Ebanyat Decl. ¶ 12, which
2   included an arbitration provision and a class action waiver. 2021 Terms of Use at 19–23.
3       In February 2023, NBA updated their terms of use and reflected this change on
4   NBA.com's terms of use webpage. Id. ¶ 12. The 2023 Terms of Use included updated
5   language regarding arbitration procedures, class actions and a new forum selection clause.
6   2023 Terms of Use (dkt 28-4) at 30. An email was sent to all current and former League
7   Pass subscribers notifying them of the changes. Id. ¶ 17. The email included language
8   specifically referencing arbitration procedures and a hyperlink to the updated webpage.
9   Ebanyat Decl. ¶ 18. In June 2023, the NBA updated the subscriber agreement to include
10  the following language:

> BY ACCESSING A SERVICE, YOU AGREE TO BE BOUND BY THIS SUBSCRIBER AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN, INCLUDING, BUT NOT LIMITED TO, THE SITE TERMS OF USE AND THE NBA.COM NETWORK PRIVACY POLICY…. THIS SUBSCRIBER AGREEMENT INCORPORATES BY REFERENCE AN ARBITRATION AGREEMENT, A CLASS AND COLLECTIVE ACTION WAIVER, AND A JURY TRIAL WAIVER THAT AFFECT YOUR RIGHTS. IN ARBITRATION THERE IS NO JUDGE OR JURY AND THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT. YOU HAVE AN OPPORTUNITY TO OPT OUT OF THE ARBITRATION AGREEMENT AS SET FORTH IN THE TERMS OF USE. PLEASE REVIEW THESE PROVISIONS CAREFULLY.
>
> …
>
> PRIVACY POLICY AND SITE TERMS OF USE
>
> You agree to the Site Terms of Use (the "Terms"), posted at https://nba.com/termsofuse and the NBA.com Network Privacy Policy ("Privacy Policy"), posted at https://nba.com/privacypolicy. We may change the Terms and/or the Privacy Policy from time to time. To the extent of any conflict between the terms or conditions of this Agreement and the terms or conditions of the Terms and/or Privacy Policy, the terms and conditions of this Agreement will govern. *Without limiting the generality of the foregoing, you acknowledge that you have read and agree to the Terms and the Privacy Policy, and you understand that your subscription and your use of the Service is subject to the Privacy Policy and the Terms, including, without limitation, the Terms' clauses titled, "DISPUTE RESOLUTION; SMALL CLAIMS COURT; AGREEMENT TO ARBITRATE", "CLASS ACTION WAIVER;*

United States District Court
Northern District of California

3

*JURY TRIAL WAIVER", and "DISCLAIMER OF WARRANTIES AND DAMAGES; LIMITATION OF LIABILITY".*

Ebanyat Decl. ¶ 21. The blue font indicated hyperlinks to the relevant NBA contracts or the provisions within those contracts. 2023 Subscriber Agreement at 2–3.

In short, both the 2021 and 2023 Terms of Use included the arbitration clause, but only the 2023 Terms of Use included the forum selection clause. See 2021 Terms of Use; 2023 Terms of Use. Both subscriber agreements included express language that at any time the NBA could change the terms of the agreement or of the incorporated terms of use. Ebanyat Decl. ¶¶ 11, 21.

### 2. The Plaintiffs

In November 2022 Plaintiff Victor Fuentes purchased a League Pass subscription. Id. ¶ 29; see also Compl. ¶ 107. In subscribing, Fuentes would have encountered the billing info page and affirmatively clicked the "Agree and Subscribe" button. Ebanyat Decl. ¶ 29. NBA sent an email in February 2023 notifying Fuentes of the changes to the terms of use. Id. ¶ 30. Fuentes subsequently accessed League Pass content from NBA's mobile app at least 15 times between February and March 2023, and he remained an active subscriber until December 2024. Id. ¶¶ 31–32.

In October 2023 Plaintiff James Whalen purchased a League Pass subscription. Id. ¶ 24; Compl. ¶ 107. Whalen also would have encountered the billing info page. Ebanyat Decl. ¶ 24. Whalen also would have affirmatively clicked "Agree and Subscribe." He accessed League Pass content from October 2023 until at least February 2025. Id. ¶ 26.

Records indicate that neither Fuentes nor Whalen ever attempted to opt out of the arbitration agreement contained in either of the terms of use. Id. ¶¶ 27, 33.

### B. Procedural Background

In January 2025 Fuentes and Whalen filed their complaint alleging that NBA violated the federal Video Privacy Protection Act by intentionally disclosing League Pass users' personally identifiable information to third parties without their consent. Compl. ¶ 5. NBA filed two motions in response: a motion to transfer the case to the Southern

District of New York and a motion to compel individual arbitration. NBA asserts that Plaintiffs are bound by both the forum selection clause and arbitration clause contained in the 2023 Terms of Use. Mot. to Transfer at 7.

## II.  LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). District courts enjoy broad discretion in considering motions to transfer venue and are to adjudicate motions for transfer according to "individualized, case-by-case consideration of convenience and fairness." Van Dusen v. Barrack, 376 U.S. 612, 622 (1964). But a valid forum selection clause changes the analysis because it trumps the plaintiff's choice of forum and any consideration of private interests (that is, concerns about the forum's convenience for parties or witnesses). Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 63–64 (2013).

## III.  DISCUSSION

The Court starts and ends with the motion to transfer. Because the Court grants that motion, the motion to compel arbitration is not properly before this Court; instead, it must be heard by the U.S. District Court for the Southern District of New York. See Suski v. Coinbase, Inc., 55 F.4th 1227, 1230 (9th Cir. 2022) ("A contract containing a forum selection clause supersedes an arbitration agreement where 'the forum selection clause[]… sufficiently demonstrate[s] the parties' intent to do so.'" (citation omitted)).

The Court begins its analysis by determining whether there is a valid contract between the parties. From there, the Court determines whether the contract contains a valid forum selection clause.

### A.  Contract Formation

Plaintiffs contest that a contract was formed between them and the NBA. Opp. at 9. As the party seeking to enforce the forum selection clause, the NBA "bears 'the burden of proving the existence of an agreement … by a preponderance of the evidence.'" Norcia v. Samsung Telecomms. Am., LLC., 845 F.3d 1279, 1283 (9th Cir. 2017) (citation omitted).

5

     Under governing law,[1] the parties must manifest their mutual assent to form a contract. Id. Whether the parties manifested their assent to a contract is determined by an objective reasonableness standard that considers the totality of the circumstances. Oberstein v. Live Nation Ent., Inc., 60 F.4th 505, 514 (9th Cir. 2023). Online contracts like this one are only enforceable if (1) the website provides reasonably conspicuous notice of the terms and (2) the consumer takes some affirmative action manifesting assent, such as clicking a button or checking a box. Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2023).

     Plaintiffs do not dispute that they took an action that would manifest assent, as they both affirmatively clicked "Agree and Subscribe." Reply at 17. Thus, the entire inquiry hinges on whether NBA.com's website provided reasonably conspicuous notice of the contracts at issue and the clauses therein. To determine if it did, this order will address (1) whether Plaintiffs received sufficient notice of the subscriber agreement at the time of their original League Pass purchase, (2) whether the terms of use were effectively incorporated into the subscriber agreements, and (3) whether the email regarding the 2023 Terms of Use constituted an enforceable modification.

### 1.   Subscriber Agreements

     The 2022 and 2023 Subscriber Agreements hyperlinked through the billing info page qualify as sign-in wrap agreements, a form of online contract where the user creates an online account and the sign-up screen indicates that doing so entails acceptance of a contract. Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 464 (2021). Sign-up wrap agreements contain a link to the terms of the agreement, but consumers are not required to scroll through the contract or otherwise affirmatively indicate that they have read the

---

[1] All the NBA agreements include a choice of law provision requiring disputes relating to the League Pass to be governed by New York law. 2022 Subscriber Agreement at 11; 2021 Terms of Use (dkt. 28-3) at 23; 2023 Terms of Use at 20; 2023 Subscriber Agreement at 11. The parties disagree on whether California or New York law should govern. See Mot. to Transfer at 14; Mot. to Compel at 14; Opp. at 10. This is immaterial at this stage, though, as "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" Berman, 30 F.4th at 855 (citation omitted).

6

1   agreement beyond clicking the button to complete their purchase. Id. When analyzing
2   these types of contracts to determine if formation occurred, the Ninth Circuit looks at
3   (1) the nature and context of the transaction and (2) the visual prominence of the notice on
4   the webpage. Chabolla v. ClassPass Inc., 129 F.4th 1147, 1155 (9th Cir. 2025).

### a.  Context of Transaction

Under California law, "the full context of any transaction is critical to determining whether any particular notice is sufficient to put a consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page." Sellers, 73 Cal. App. 5th at 453. Some relevant factors include whether there is a full registration process indicative of an ongoing relationship, whether the service is offered as a free trial, whether the user provides their credit card information, and whether the user downloads a mobile app on their phone (which would "suggest[] consistent accessibility"). Godun v. JustAnswer LLC, 135 F.4th 699, 710 (9th Cir. 2025).

To subscribe to League Pass, both Plaintiffs created an NBA.com account and provided their credit card information. Ebanyat Decl. ¶¶ 4, 7. There is no indication that NBA ever offered League Pass as a free trial or presented it to Plaintiffs in that manner. Both Plaintiffs downloaded the NBA mobile app to access content. Id. ¶¶ 23, 28. These factors are all indicative of an ongoing relationship that should have put Plaintiffs on alert for contractual terms. See Godun, 135 F.4th at 710.

Both Plaintiffs also elected for an annual subscription, gaining access to a season's worth of content for a "one-time purchase of $99.99." Opp. at 10. Ordinarily, a recurring subscription should make consumers aware that ongoing contractual terms may apply. Sellers, 73 Cal. App. 5th at 480. Yet Plaintiffs assert that the automatic re-enrollment heightens the notice requirement because "it must be clear that consumers agree not only to the one-time purchase, but also to the continuing purchases going forward." Godun, 135 F.4th at 712. They contend that the order summary box did not adequately apprise Plaintiffs of the automatic renewal, so this case should be treated like a one-time transaction rather than an ongoing relationship. Opp. at 11.

7

1    Their argument is unpersuasive, though.  The paragraph above the "Agree and
2    Subscribe" button specifically advises consumers of the automatic renewal and outlines the
3    legal significance of their action in clicking the button.  Ebanyat Decl. ¶ 7.  League Pass is
4    a subscription service at its core, whether offered as a monthly or yearly subscription.
5    Indeed, Plaintiffs both accessed League Pass content for multiple years and thus would
6    have had to make multiple rounds of payments.  Ebanyat Decl. ¶¶ 27, 29–33.  Plaintiffs
7    have not submitted anything supporting the proposition that they were not aware of or did
8    not agree to the automatic renewal at the time of their original purchase.

Accordingly, the full context of Plaintiffs transactions should have put them on notice for a link to the terms governing that ongoing relationship.  See Sellers, 73 Cal. App. 5th at 479.

### b.    Visual Elements of the Website

To provide reasonably conspicuous notice, the advisal on the website must be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."  Berman, 30 F.4th at 856.  That said, the Ninth Circuit has "not created a checklist for website designers," nor has it "generated per se design rules that must be followed for a contract to be formed between a website user and provider."  Godun, 135 F.4th at 710.  Courts therefore determine the conspicuousness of notice by looking at characteristics like size of the text, the color of text compared to the background, the location and proximity to the box or button users click to continue to use the website, the obviousness of the associated hyperlink, and whether other elements on the screen clutter or otherwise obscure textual notice.  Sellers, 73 Cal. App. 5th at 473.

Plaintiffs assert that the NBA's billing info page has multiple indicia of inconspicuousness, as the hyperlink is merely underlined and buried within a large paragraph of small text.  Opp. at 11–12.  The hyperlink is the same color as the rest of the paragraph and not positioned directly above or below the "Agree and Subscribe" button. Id. at 12–16.  As such, Plaintiffs argue that the "cluttered" billing info page cannot provide users with reasonably conspicuous notice of the hyperlinked agreement.  Opp. at 11–16.

  While Plaintiffs correctly describe some aspects of the website, others make the notice sufficiently visually prominent. The website's design is comparable to the one at issue in <u>Keebaugh v. Warner Bros. Entertainment Inc.</u>, 100 F.4th 1005, 1010–11 (9th Cir. 2024), where the court found hyperlinked terms provided sufficient notice. That website, which was dominated by imagery from Game of Thrones, invited the users to click a blue "Play" button at the bottom of the screen. <u>Id.</u> Below the button in small white font, the user was advised "By tapping 'Play' I agree to the Terms of Service." <u>Id.</u> The terms of service were immediately below the white-font advisory. <u>Id.</u> The court held that the sign-in screen was "conspicuous and put[] the reasonable user on notice that they are agreeing to be bound by the Terms of Service." <u>Id.</u> at 1021.

  Similarly here, the hyperlink to the terms of use is contained within a short paragraph in dark grey text against a white background. The paragraph is located directly above the "Agree and Subscribe" button and specifically indicates that clicking the button is an acknowledgement and agreement to the terms. The hyperlinks are underlined, which, given the overall design and structure of the website, makes them clearly identifiable as hyperlinks.[2] Especially given the context of the transaction as discussed above, a reasonable internet user in Plaintiffs' position would recognize that the underlined text was a hyperlink to terms governing their subscription.

  The website's visual elements therefore would put a reasonably prudent internet user on notice of the subscriber agreement. But even if the visual elements were at most neutral—which is the most generous reading to Plaintiffs when evaluating the website as a whole—that conclusion, when combined with the ongoing nature of the transaction, would support a finding that Plaintiffs had constructive notice of the agreement.

  **2. Incorporated Terms**

  Plaintiffs then contend that, even if there was constructive notice for the subscriber

---

[2] To be sure, "simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists." <u>Berman</u>, 30 F.4th at 857. But this is not a <u>per se</u> rule, and courts must consider the website's appearance in its entirety. <u>Id.</u>

9

1  agreement, they did not have notice of the terms of use. They argue that "online contract
2  formation should not be a scavenger hunt" and that, because the arbitration agreement and
3  forum selection clauses were in the terms of use and not the subscriber agreements, they
4  cannot be enforced against them. Opp. at 16. NBA responds that the terms of use are
5  enforceable because they were expressly incorporated into the subscriber agreements.
6  Mot. to Transfer at 10; Mot. to Compel at 9.

Under California law, "[i]ncorporation by reference requires that (1) the reference to another document was clear and unequivocal; (2) the reference was called to the attention of the other party, who consented to that term; and (3) the terms of the incorporated documents were known or easily available to the contracting parties." Kleveland v. Chi. Tit. Ins. Co., 141 Cal. App. 4th 761, 765 (2006). These criteria are satisfied here. Both subscriber agreements state that consumers consent to the incorporated terms of use by subscribing to League Pass. 2022 Subscriber Agreement at 2; 2023 Subscriber Agreement at 2. Both agreements provide hyperlinks to the incorporated documents in bright blue font, calling the attention of the consumer and enabling easy access. 2022 Subscriber Agreement at 3; 2023 Subscriber Agreement at 2–3.

Plaintiffs point out, however, that the "the multi-step process an internet user must endure to reach the 'terms page' hyperlink further minimizes the chance that they will receive notice of the terms." Opp. at 17 (citing Ramirez v. Trusper, Inc., No. 5:24-cv-0212-EJD, 2024 WL 4479862, at *6 (N.D. Cal. Oct. 11, 2024)). The analysis by the courts in B.D. v. Blizzard Entertainment Inc., 76 Cal. App. 5th 931, 952 (2022), and Sellers, 73 Cal. App. 5th 444, are instructive on that point. In B.D., the court addressed a sign-in wrap agreement (like the one at issue here) that incorporated by reference a dispute resolution policy. B.D., 76 Cal. App. 5th at 952. The agreement contained the following language:

> Any and all disputes between you and Blizzard which arise out of this Agreement will be resolved in accordance with the Blizzard Entertainment Dispute Resolution Policy, which is available for your review here.

Id. The court found sufficient notice of the expressly incorporated terms, as the underlined

10

word "here" was a hyperlink in blue font, the sign-in language clearly and unequivocally referred to the resolution policy by name, and the underlying contract was easily accessible. Id. In contrast, the Sellers court found that an arbitration clause that was incorporated by reference was not enforceable because the language did not properly notify the user that the incorporated terms would be binding. Sellers, 73 Cal. App. 5th at 483–84. The number of clicks from the sign-in page to the terms was not the only, or even a primary, motivating factor for either court, even though both courts did mention the number of clicks (one in B.D., two in Sellers). See id.; B.D., 76 Cal. App. 5th at 952. This is consistent with California law, which requires courts to evaluate the totality of the circumstances in deciding whether the reasonable consumer would be aware of contract terms. Godun, 135 F.4th at 709.

The NBA's subscriber agreements are more similar to the agreement in B.D. than the one in Sellers. Both iterations of the NBA subscriber agreement use clear language indicating that the subscribers are bound by the terms of use. This clear labeling and up-front mention of the terms of use is more important than the mere fact that consumers need to click two links, rather than one, from the sign-in page to access the terms of use.

Thus, both agreements and hyperlinks are reasonably conspicuous, and a reasonably prudent internet user would be put on notice that they would be bound by the terms found in each hyperlink.

### 3. Modification via Email

When Whalen signed up for NBA in October 2023, he agreed a contract that incorporated by reference the 2023 Terms of Use, which included a forum selection clause. When Fuentes signed up for NBA in 2022, however, the operative terms of use (the 2021 Terms of Use) did not include that clause. Fuentes now asserts that the forum selection clause in the 2023 Terms of Use does not apply to him.

The 2022 Subscriber Agreement that Fuentes agreed to at the time of his original League Pass purchase stated:

11

> We reserve the right to make changes, modifications, amendments and/or updates to the terms in the Subscriber Agreement from time to time for any reason, by posting such changes in this document… We may change the Terms and/or the Privacy Policy from time to time.

2022 Subscriber Agreement at 2–3. Similarly, the 2021 Terms of Use stated that they "may be amended or modified, or new conditions imposed, at any time." 2021 Terms of Use at 2. NBA's email to Fuentes included a hyperlink to the new agreement, specifically indicating that "continued use of our websites and mobile apps is your agreement to these updated terms and policies." Ebanyat Decl. ¶¶16–17.

Plaintiffs raise three issues: (1) whether the email provided constructive notice of the new terms, (2) whether the record of the email being sent is sufficient to establish notice, and (3) whether the new terms constituted an enforceable modification. Opp. at 18–19. If Plaintiffs are correct and the 2023 Terms of Use is not binding on Fuentes, then only the arbitration clause would be enforceable against him.[3] If the 2023 Terms of Use is binding on Fuentes, then the forum selection clause will take precedence over the original arbitration clause contained in the 2021 Terms of Use. See Suski, 55 F.4th at 1230.

### a. Constructive Notice

The first issue is whether the email provided Fuentes with constructive notice. In Kamath v. Coinbase, Inc., No. 23-cv-03533-CRB, 2024 WL 950163, at *4 (N.D. Cal. Mar. 5, 2024), the plaintiff entered into an online agreement that was later modified via email. The email, in combination with the plaintiff's continued use of services, was "enough to establish reasonably conspicuous notice and assent to the [updated terms]." Id. (collecting cases). The same standard of constructive notice as before applies here, see Sadlock v. Walt Disney Co., No. 22-CV-09155-EMC, 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023), and just as before the NBA email was concise and easy to read. It requested users

---

[3] In their brief, Plaintiffs assert that, if there was constructive notice of the original subscriber agreement, this Court must enforce the forum selection clause rather than staying the action pending arbitration. Opp. at 20. The Court does not follow Plaintiffs' reasoning. If the email did not put Fuentes on constructive notice of the modified terms, the forum selection clause would not apply to him—but the arbitration clause (which was in the terms of use that were in effect when he signed the subscriber agreement) would.

to read the agreement, accessible via a hyperlink.  Ebanyat Decl. ¶18.  The email included language indicating that the changes were related to dispute resolution procedures and provided an email for subscribers to contact with any questions.  Id.  The email also clearly outlined the legal consequences of subscribers' manifestation of assent through their continued use of League Pass, which supports finding constructive notice.  See Sadlock, 2023 WL 4869245, at *13.

Thus, the email provided Fuentes with constructive notice of the 2023 Terms of Use.

### b. Email Receipt

The second dispute centers around whether the NBA's declaration attesting that that the email was sent to Fuentes is enough to establish constructive notice of the 2023 Terms of Use.  Plaintiffs assert that "it is insufficient proof of inquiry notice for a defendant to merely show that it sent out an email to a plaintiff informing them of updates to legal terms and that the plaintiff continued to use the services afterwards."  Opp. at 18 (citing Sifuentes v. Dropbox, Inc., No. 20-cv-07908-HSG, 2022 WL 2673080, at *3–4 (N.D. Cal. June 29, 2022); Ireland-Gordy v. Tile, Inc., 760 F. Supp. 3d 946, 955 (N.D. Cal. 2024); and Pliszka v. Axos Bank, No. 24-cv-445-RSH-SBC, 2024 WL 4194338, at *6 (S.D. Cal. Sept. 13, 2024)).

Plaintiffs' characterization of the case law is only partially true.  To be sure, "courts have declined to adopt a per se rule finding that inquiry notice is satisfied 'in any instance in which a defendant sends an email giving notice of updated terms and a plaintiff continues to use the defendant's service.'"  Ireland-Gordy, 760 F. Supp. at 955 (citation omitted).  But in two of Plaintiffs' cases the parties alleging inadequate notice expressly denied ever having received or read the updated terms.  Sifuentes, 2022 WL 2673080, at *4; Ireland-Gordy, 760 F. Supp. at 955.  That is consistent with California law, which provides that "if a party shows that a letter was mailed, a rebuttable presumption arises that it was received."  Pronos v. SkyOne Fed. Credit Union, 2024 WL 4799118, at *3 (C.D. Cal. Sept. 30, 2024).  Because Plaintiffs submitted no evidence to rebut the presumption of

13

1  receipt, NBA's proof that the email was sent is sufficient to establish that Fuentes received
2  the email.

### c.  Consideration

Plaintiffs also assert that NBA's unilateral modification of the terms in the middle of performance constitutes an unenforceable modification, as there was no consideration. Opp. at 19.  Plaintiffs only cite to one case in support of this proposition.  Id. (citing Seneca v. Homeaglow, Inc., 2024 WL 750029 (C.D. Cal. Feb. 7, 2024)).  Seneca is inapplicable, though, as that case involved the defendant's unilateral imposition of additional terms after already receiving payment for what was presented to plaintiffs as a one-time transaction.  Id. at *6.  This case, which involved a Plaintiff who had an ongoing contractual relationship with NBA (and, in fact, who continued his subscription even after being notified of the modified terms), is not analogous.  Additionally, the Ninth Circuit has held that a defendant's "promise to be bound by the arbitration process itself serves as adequate consideration."  Cir. City Stores, Inc. v. Najd, 294 F.3d 1104, 1108 (9th Cir. 2002).  The NBA not only added the forum selection clause to the 2023 Terms of Use, but also updated aspects of the arbitration agreement and procedures.  2021 Terms of Use at 19–22; 2023 Terms of Use at 22–29.  As such, there was consideration for the modification.

Because the email notification of the updated terms of use was an enforceable modification that gave sufficient notice to Plaintiffs, it governs here.

### B.  Forum Selection Clause

Plaintiffs do not challenge the validity of the forum selection clause beyond the notice-related arguments that have been previously addressed.  Opp. at 14.  Thus, because forum selection clauses are presumed valid, see Manetti-Farrow v. Gucci Am., Inc., 858 F.2d 509, 514 (9th Cir. 1988), the forum selection clause in NBA's 2023 Terms of Use is valid and enforceable.

14

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the NBA's motion to transfer, leaving the U.S. District Court for the Southern District of New York to decide the arbitration issue.

**IT IS SO ORDERED.**

Dated: July 16, 2025



CHARLES R. BREYER
United States District Judge